(No. 80332

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. RONALD BARROW, Appellant.

*Opinion filed January 29, 2001.—Rehearing denied June 4, 2001.*

510

FREEMAN, J., concurring.
HARRISON, C.J., concurring in part and dissenting in part.
McMORROW, J., dissenting.

Leonard L. Cavise, of Chicago, for appellant, and Ronald Barrow, of Menard, appellant *pro se.*

No appearance for the People.

JUSTICE MILLER delivered the opinion of the court:
The defendant, Ronald Barrow, appeals from an order of the circuit court of La Salle County dismissing, without an evidentiary hearing, his amended petition for post-conviction relief. Because the defendant was sentenced to death for the underlying murder conviction, the present appeal lies directly to this court. 134 Ill. 2d R. 651(a).

In May 1985, following a jury trial in the circuit court of La Salle County, the defendant was convicted of murder, armed robbery, residential burglary, and burglary. The same jury later found him eligible for the death penalty because of his commission of murder during the course of a felony. See Ill. Rev. Stat. 1983, ch. 38, par. 9—1(b)(6). The jury also found that there were no mitigating factors sufficient to preclude a sentence of death. Accordingly, the trial judge sentenced the defendant to death for the murder conviction. The judge also sentenced him to a 30-year prison term for armed robbery and to a 15-year prison term for residential burglary, with the sentences to be served consecutively; no sentence was imposed on the conviction for burglary. On direct appeal, this court affirmed the convictions and

sentences. *People v. Barrow*, 133 Ill. 2d 226 (1989). The United States Supreme Court denied the defendant's petition for a writ of *certiorari. Barrow v. Illinois*, 497 U.S. 1011, 111 L. Ed. 2d 767, 110 S. Ct. 3257 (1990).

The defendant later instituted the present action by filing a *pro se* petition for post-conviction relief in the circuit court of La Salle County. The court appointed counsel to assist the defendant, and counsel filed an amended petition. The defendant subsequently requested leave to file a "supplemental *pro se* post-conviction petition," which the court denied. The State moved to dismiss the amended petition, and, after hearing arguments, the court granted the State's motion and dismissed the amended petition without an evidentiary hearing. The circuit judge concluded that the defendant's post-conviction claims were barred by the doctrine of *res judicata*, did not allege an issue of constitutional magnitude, or did not involve errors that would have affected the outcome of defendant's trial. The defendant brings this appeal from the dismissal of his amended post-conviction petition, and we now affirm the judgment of the circuit court.

The testimony introduced at the defendant's trial is set forth fully in this court's opinion on direct appeal. *Barrow*, 133 Ill. 2d at 238-45. Because much of this evidence is also relevant to the arguments raised in these post-conviction proceedings, however, we find it helpful to present a detailed summary of the trial testimony here.

Darlene Brown, the victim's daughter, testified that on February 18, 1984, she was with her father, Joseph O'Berto, at his home from about 7 p.m. until 9 p.m. The next afternoon, on February 19, Brown, her husband, and her father-in-law found O'Berto lying in the basement of his home in a pool of blood; he had been shot in the head. The front door of the house was unlocked, and several rooms were in disarray. Brown determined that

some of her father's possessions were missing, including his wallet, which usually contained about $500 in hundred-dollar bills, a bankbook showing $20,000 on deposit, and a gold money clip. Hayden Baldwin, a crime scene technician, testified that several of the stairs leading to the victim's basement had been "torn up" and, in the basement, he observed an empty safe and three slot machines. Baldwin examined the front and rear doors of the victim's house and found no signs of forced entry.

Leroy Blum, the victim's next-door neighbor, testified that on February 18, 1984, he observed the outside light at the victim's home go off around 9 p.m. and then turn on again around 10:30 p.m. Around 1:15 a.m., Blum noticed that the light was on; later, at 3 a.m., Blum awoke and saw that the light was off.

Harry Hockings, an Illinois state trooper, testified that on March 15, 1984, Judy Herron informed him that her boyfriend, Harold "Smokey" Wrona, who was then serving a sentence in a Maryland state prison, had information regarding the victim's death and wanted to talk to Hockings about the case. Officer Hockings and La Salle County Sheriff Pete Wahl met with Wrona in the Maryland prison where Wrona was incarcerated. Officer Hockings testified that, because of the information provided by Wrona, arrangements were made with Maryland law enforcement authorities to have Wrona released from prison so that he could meet with the defendant and provide an opportunity for the defendant to incriminate himself in the matter. On April 6, 1984, Wrona met the defendant in Maryland in a hotel room specially equipped with hidden audiovisual equipment. After making a number of incriminating statements to Wrona, the defendant was arrested and charged with the offenses involved here.

At trial, Wrona explained that he first met the defendant in July 1983, while they were both incarcerated at a

Maryland prison. Wrona testified that, while in prison, he told the defendant that, in 1966, two of his friends had committed a burglary at a home in Cedar Point, Illinois, stealing $64,000 that they had found under a basement stair. Wrona further related to the defendant that his friends told him that they had also found three "barrels of change" in the basement, which they did not take. Wrona told the defendant that his friends later learned that an additional $175,000 was hidden in a basement stair where they had not searched.

Wrona testified that the defendant visited him in the Maryland prison on February 2, 1984, following the defendant's release on bond pending appeal. According to Wrona, the defendant asked about the Cedar Point robbery, sought directions to the town, and had Wrona describe the house involved.

Wrona further testified that the defendant visited him again in prison several weeks later, on February 24, 1984. On that occasion, the defendant said that he had made "a pretty good score" in Cedar Point. According to Wrona's testimony, the defendant recounted that he and his brother, Bruce Barrow, had watched the victim's home for about one week. Late one night, the defendant knocked on the victim's front door and asked to use the telephone because he was having car trouble. The defendant then stuck his foot in the door, pushed the victim back into the house with a gun, and handcuffed him. The defendant said that the victim's wallet contained five one-hundred dollar bills and that he also found a bankbook showing a balance of $18,000. In the basement, the defendant saw an empty safe and three slot machines covered with plastic. The defendant stated that he and his brother "tore a couple stairs up" but did not find any money hidden under them. The defendant also told Wrona that he asked the victim where the money was; because the man could not hear, the defendant then

"whipped him." While pointing a finger to his head, the defendant said that he "had to take him out of it." Wrona also testified that the defendant said that he and his brother wore gloves the entire time they were in the victim's home. The defendant related that he disposed of the gun in a river in Indiana later that night, just before he was stopped by an Indiana state trooper for speeding.

The tape recording of the defendant's conversation with Wrona in the Maryland hotel room was also played for the jury, and a transcript of the recording was received into evidence. As recorded on the tape, the defendant told Wrona that "everything went just like *** we had planned it." The defendant said that, after watching the victim's home for a week, he forced his way into the residence one evening after midnight. The defendant stated that although he hit the victim "all over," the victim refused to tell the defendant anything except "where he kept change." The defendant said that he then searched everywhere but could find only an empty safe in the basement. The defendant also stated that he "pulled up" the first two stairs leading to the basement but did not find any money there. Wrona asked the defendant what kind of gun he used, and the defendant replied that it was a "hot, nine mil[limeter]" from Delaware. The defendant stated that he tossed the gun off a bridge on his return trip east.

The State also presented evidence showing that the defendant, who lived in Maryland, was in the vicinity of Cedar Point around the time of the victim's murder. Judy Herron, Wrona's girlfriend, testified that in February 1984 the defendant and his brother, Bruce, visited her home in Seatonville, which is about 20 miles from Cedar Point. Herron testified that the defendant was driving a white car and that he told her that he was staying at the Holiday Inn motel in Peru under an assumed name. According to Herron, the defendant and his brother

returned several days later. At that time, the defendant told Herron that his brother had been stopped for a traffic offense the previous evening, and that they had been lucky because the police officer had not discovered a gun that was in the car at the time.

Several other witnesses at trial also gave testimony establishing that the defendant was in the area at the time of the offenses involved here. An employee of a car rental agency in Delaware testified that on February 11, 1984, the defendant rented a white Ford Thunderbird, with license plate number 744741. A clerk at the Holiday Inn motel in Peru testified that defendant and another man checked into room 123 on February 13, 1984, and checked out on February 19, 1984. A police officer testified that on February 16, 1984, she observed Bruce Barrow driving the wrong way down a one-way street in La Salle. The officer stopped the car, a white Ford Thunderbird with Delaware license plate number 744741, and asked Bruce for his driver's license. According to the officer, Bruce identified himself as William Payne and said that he had a Delaware driver's license but did not have it with him at that moment. Bruce was then taken to the police station, where he called the Peru Holiday Inn and asked for room 123. A second police officer testified that Bruce asked him to talk on the telephone to a person who identified himself as Ronald Barrow. A short time later, a man who said he was Ronald Barrow called and asked to speak to William Payne. Another police officer also testified that he received a call that night at the police station from a man named Ronald Barrow, who asked to speak with William Payne. Bruce Barrow was released from custody later that night.

Walter Hamlin testified that at approximately 10 p.m. on February 18, 1984, the day of the murder, he saw a man whom he identified as Bruce Barrow enter his parents' restaurant in Cedar Point and purchase ciga-

rettes and candy. Curtis Barmes, an Illinois state trooper, testified that on February 19, 1984, at about 1:55 a.m., he observed a white Ford Thunderbird, with Delaware license plate number 744741, traveling north on Route 51 at a point south of the Illinois River bridge near Cedar Point. Officer Barmes observed two white males in the car; Ronald and Bruce Barrow are white. Officer Barmes also testified that the only way the car could have reached Route 51 at that point near the Illinois River bridge would have been by turning off a road that led from Cedar Point.

Dave Doll, an Indiana state trooper, testified that on February 19, 1984, at around 5:07 a.m. Eastern Standard Time, he observed the defendant driving a white Ford Thunderbird east on the Indiana Toll Road. Officer Doll followed the car from the Michigan City toll plaza for 20 to 30 miles before stopping the vehicle and issuing the defendant a ticket for speeding. Officer Doll stated that another man was in the car, asleep. Evidence showed that the distance from the Illinois River bridge outside Cedar Point to the location where Officer Doll stopped the defendant was about 160 miles.

The prosecution also presented evidence to link a pair of the defendant's shoes, which were found in a search of defendant's mother's home in Maryland, where the defendant lived, to the impression of a shoe recovered from a piece of plywood found in the victim's basement. Robert Hunton, a forensic scientist with the Illinois Department of Law Enforcement, stated that the shoes "could have made the footwear impressions," for the size and pattern of the soles matched those shown on the impression.

At the close of the State's case, the defendant moved for a directed verdict; the trial court denied the motion. The defense did not present any evidence. As earlier noted, at the conclusion of the trial the defendant was

found guilty of murder, armed robbery, residential burglary, and burglary. A capital sentencing hearing was then held, and the defendant was sentenced to death for the murder conviction. Because the defendant does not raise, in this post-conviction proceeding, any contentions concerning the sentencing hearing, we do not find it necessary to summarize the evidence presented at sentencing.

In this appeal from the dismissal of the amended post-conviction petition, the defendant is represented by counsel, who has filed an appellate brief. The defendant has also filed a *pro se* "supplemental brief." After defense counsel filed the appellate brief, counsel filed a motion for a limited remand to the circuit court for purposes of discovery in light of *People v. Olinger*, 176 Ill. 2d 326 (1997), which we allowed. Upon remand, the circuit court permitted the defendant to take the depositions of three persons. The circuit court then returned the cause to this court.

During the course of these proceedings, this court granted the State numerous extensions of time in which to file its brief. On October 29, 1998, this court granted the State's sixth request, extending the filing date until December 17, 1998. That order read, "Final extension. This case will be submitted without the brief of appellee if it is not timely filed." On December 23, 1998, the State sought leave to file its brief *instanter*. This court denied the motion and later denied the State's motions for reconsideration. Thus, we address the defendant's appeal without a brief from the State.

I

At the outset, we note the scope and purpose of post-conviction proceedings. The Post-Conviction Hearing Act (725 ILCS 5/122—1 through 122—7 (West 1998)) provides a remedy by which defendants may challenge their convictions or sentences for violations of federal or state

constitutional law. *People v. Towns*, 182 Ill. 2d 491, 502 (1998); *People v. Tenner*, 175 Ill. 2d 372, 377 (1997). A post-conviction action is a collateral proceeding, and not an appeal from the underlying judgment. *People v. Williams*, 186 Ill. 2d 55, 62 (1999); *Towns*, 182 Ill. 2d at 502. The purpose of the proceeding is to allow inquiry into constitutional issues relating to the conviction or sentence that were not, and could not have been, determined on direct appeal. *People v. Griffin*, 178 Ill. 2d 65, 72-73 (1997); *People v. Mahaffey*, 165 Ill. 2d 445, 452 (1995). Thus, *res judicata* bars consideration of issues that were raised and decided on direct appeal, and issues that could have been presented on direct appeal, but were not, are considered waived. *Towns*, 182 Ill. 2d at 502-03; *Griffin*, 178 Ill. 2d at 73.

A defendant is not entitled to an evidentiary hearing on a post-conviction petition as a matter of right. *People v. Hobley*, 182 Ill. 2d 404, 427-28 (1998). Rather, an evidentiary hearing is warranted only when the allegations of the post-conviction petition, supported when necessary by the trial record or accompanying affidavits, make a substantial showing that the defendant's constitutional rights have been violated. *Hobley*, 182 Ill. 2d at 428; *Towns*, 182 Ill. 2d at 503. In determining whether to grant an evidentiary hearing, all well-pleaded facts in the petition and in any accompanying affidavits must be taken as true. *Towns*, 182 Ill. 2d at 503. A circuit court's dismissal of a post-conviction petition without a hearing will be reviewed *de novo*. *People v. Coleman*, 183 Ill. 2d 366, 389 (1998).

The defendant first argues that he was denied the effective assistance of trial counsel. To prevail on a claim of ineffective assistance of counsel, a defendant must show both that counsel's representation was deficient and that the asserted deficiency in counsel's performance prejudiced the defendant. *Strickland v. Washington*, 466

U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Establishing prejudice under the *Strickland* inquiry requires a defendant to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.

The defendant argues that his trial counsel, Wayne McFarland, was ineffective because he erroneously advised the defendant not to testify. The defendant further asserts that trial counsel was ineffective because he promised in his opening statement to show that the defendant was not guilty but later rested without presenting a defense. This court rejected these arguments on direct appeal (*People v. Barrow*, 133 Ill. 2d 226, 246-50, 268 (1989)), and therefore reconsideration of the same contentions is barred here.

Specifically, the defendant argued on direct appeal that trial counsel was ineffective because he erroneously advised the defendant to forgo presenting any evidence so that the defendant could preserve for review the argument that the trial court had erroneously denied the defense motion for a directed verdict. After the trial court denied the motion for a directed verdict, defense counsel stated:

> " 'The law in Illinois, I believe, says that if we proceed to present evidence at this time, we may \*\*\* waive our right to raise as error on appeal, if in fact, a conviction is entered, any error which may have been committed in the denial of the motion for directed verdict. I would ask that I be allowed to speak with Mr. Barrow for I'd like to have a few minutes in private to determine whether, in fact, he wants to proceed or not.' " *Barrow*, 133 Ill. 2d at 246.

After the requested recess, defense counsel informed the trial judge that the defendant did not wish to present any evidence.

On direct appeal, the defendant argued that he had intended to testify that he had obtained from the actual offender the information he told Wrona about the case, and that he was merely bragging during his recorded conversation with Wrona. *Barrow*, 133 Ill. 2d at 246-47. The defendant also argued that he had planned to call two witnesses who would have discredited the testimony of Walter Hamlin, the witness who placed the defendant's brother in a Cedar Point restaurant the night of the murder. *Barrow*, 133 Ill. 2d at 247. Finally, the defendant argued that he had intended to call a witness to testify that the impression of the shoe found at the murder scene could not have been made by the pair of shoes taken from his Maryland home. *Barrow*, 133 Ill. 2d at 247.

This court recognized on direct appeal that an election by a defendant to present evidence after the denial of a motion for a directed verdict does not waive any challenge to the ruling if the motion is renewed at the close of all the evidence. *Barrow*, 133 Ill. 2d at 249. Nonetheless, we concluded that in this case there was no reasonable probability that the outcome of the trial would have been different if the defendant had presented the evidence to which he referred. We aptly characterized the evidence of defendant's guilt as "overwhelming." *Barrow*, 133 Ill. 2d at 249. Given the great strength of the State's evidence, which included statements by the defendant implicating himself in the commission of these offenses, testimony by the defendant that he had learned of the details of the crimes from the actual offender "might have been considered insulting by the jury and been harmful to the defendant." *Barrow*, 133 Ill. 2d at 249. Moreover, if the defendant had testified, the prosecution could have cross-examined him on his previous convictions. *Barrow*, 133 Ill. 2d at 249-50. We thus concluded that the defendant failed to demonstrate prej-

udice under the *Strickland* test. *Barrow*, 133 Ill. 2d at 250.

In the present post-conviction proceeding, the defendant argues that trial counsel was ineffective because, in his opening statement, counsel promised to show that the defendant was not guilty but later rested without presenting a defense, and because trial counsel advised the defendant not to testify. We believe that this argument merely rephrases defendant's argument on direct appeal, which was that trial counsel erroneously advised defendant to forgo presenting evidence in defense. A mere change in phraseology does not warrant our reconsideration of the issues. See *People v. Emerson*, 153 Ill. 2d 100, 106-07 (1992); *People v. Albanese*, 125 Ill. 2d 100, 105 (1988). Consequently, the doctrine of *res judicata* bars our reconsideration of these claims. See *Towns*, 182 Ill. 2d at 502.

The defendant next argues that trial counsel was ineffective because he failed to investigate whether Harold "Smokey" Wrona's agreement with the police included the dismissal of pending Illinois charges against Wrona, and because counsel failed to impeach Wrona with his prior convictions. The defendant has waived these issues by failing to raise them on direct appeal. See *Towns*, 182 Ill. 2d at 503. The defendant makes the further contention, however, that appellate counsel was ineffective for failing to argue these questions on direct appeal. Allegations of ineffective assistance of appellate counsel are evaluated under the same standard that governs the performance of trial counsel. *People v. West*, 187 Ill. 2d 418, 435 (1999). Thus, a defendant who alleges that appellate counsel was ineffective must show both a deficiency in counsel's performance and prejudice resulting from the asserted deficiency. *People v. Flores*, 153 Ill. 2d 264, 283 (1992). Appellate counsel is not obligated to brief every conceivable issue on appeal, however, and it is not incom-

petence for counsel to refrain from raising issues that counsel believes are without merit. *People v. Johnson*, 154 Ill. 2d 227, 236 (1993). For these reasons, unless the underlying issue is meritorious, a defendant cannot be said to have incurred any prejudice from counsel's failure to raise that issue on appeal. *People v. Childress*, 191 Ill. 2d 168, 175 (2000).

In light of the overwhelming evidence of guilt in this case, we must conclude that the defendant has failed to establish the requisite prejudice. Even if appellate counsel had raised this issue on direct appeal, there is no reasonable probability that the result of the appeal would have been different. Even if this court had found on direct appeal that trial counsel was deficient in failing to impeach Wrona with his prior convictions and with any alleged agreement with the police, there is no reasonable probability that the court would also have concluded that, but for this deficient performance, the result of defendant's trial would have been different.

A number of witnesses placed the defendant and his brother in the vicinity of Cedar Point around the time of these offenses. Walter Hamlin testified that a person whom he identified as the defendant's brother was in his parents' restaurant on the night of the victim's murder. Several hours later, two men were seen driving away from Cedar Point in the defendant's rental car. Illinois state trooper Curtis Barmes testified that, at 1:55 a.m. on February 19, 1984, he saw two white males in the vehicle that defendant had rented, and that the only way the car could have been at the point where he saw it was by turning off a road that led from Cedar Point. Other witnesses placed the two in the area for several days preceding the offenses. Finally, the prosecution presented to the jury Wrona's testimony as well as the recording of the conversation between the defendant and Wrona in the Maryland hotel room. The defendant, in his own

words, told of the details of robbing and murdering the victim in the victim's home—details that only the offender would know, such as the "pulling up" of the basement stairs.

The defendant also alleges a number of other instances of ineffective assistance of trial counsel. The defendant argues that trial counsel was ineffective because counsel told the jury that it should judge Wrona's testimony in the same manner as the testimony of other witnesses; said in his opening statement that the prosecutor was personally convinced of the defendant's guilt and acknowledged the existence of a great deal of circumstantial evidence against his client; did not object to the prosecution's references during trial to the defendant's prior bad acts; failed to pursue the discovery of the investigating police officers' "street files" in this case; did not have the defendant's shoes and the piece of plywood from the victim's home examined by experts who had been appointed to do so; and failed to impeach Judy Herron's testimony that the defendant showed her a map of Cedar Point.

These issues could have been raised on direct appeal, but the defendant failed to argue them at that time. Accordingly, they must be considered waived. See *Towns*, 182 Ill. 2d at 503. The defendant presses the alternative argument, however, that appellate counsel was ineffective for failing to present the issues on direct appeal. Consistent with the preceding discussion, we believe that defendant has failed to establish the requisite prejudice. As noted above, the evidence of the defendant's guilt for these offenses was overwhelming. The defendant also reiterates, verbatim, several other challenges to trial counsel's performance that this court rejected on direct appeal. Because the doctrine of *res judicata* bars our reconsideration of these issues, we decline to address them again here.

We must also reject the defendant's argument that "the record taken as a whole" demonstrates that trial counsel was ineffective. Even if we were to find that counsel's performance was deficient, there is no reasonable probability that, but for counsel's performance, the result of the trial would have been different, given the substantial amount of evidence of the defendant's guilt.

## II

The defendant next argues that his right to counsel and his right to a public trial were violated when the trial court "removed the attorney who had prepared the case [Daniel Bute]" and "excluded/barred" Bute from the courtroom. On November 1, 1984, the trial court appointed Wayne McFarland, the part-time public defender of Grundy County, to represent the defendant at trial. The public defender of La Salle County was not able to represent the defendant because he was already representing the defendant's brother, Bruce Barrow, on perjury charges relating to this case. On January 3, 1985, defense counsel filed a motion for the appointment of a special assistant defense attorney on the ground that the defendant's case was unduly burdensome. The trial court granted the motion and appointed Daniel Bute, an assistant La Salle County public defender, as a special assistant to McFarland.

On January 29, 1985, the State filed a motion to remove Bute from the defendant's case, alleging the existence of a conflict of interest. According to the State, Bute and his law partner were then representing the sheriff of La Salle County in a civil matter, and Bute had previously represented the sheriff in various other matters. At the hearing on the State's motion, it was further revealed that Bute had previously represented Illinois state trooper Harry Hockings, one of the prosecution witnesses, in a divorce proceeding, and that Bute's law firm had previously represented the victim's son, another

prosecution witness, in a real estate transaction. The State argued that Bute would not be able to cross-examine these witnesses effectively. The trial court admonished the defendant of the possible conflict. The defendant stated that he waived his right to complain of any possible conflict. After finding that the defendant's waiver was voluntary, knowing, and intelligent, the trial judge denied the State's motion to remove Bute from the case.

On April 30, 1985, one week before trial was scheduled to begin, McFarland filed a motion to withdraw from the case and to have Bute substituted as counsel. In support of the motion, McFarland stated that he had recently resigned as Grundy County public defender and that the upcoming trial would interfere with a family matter. The trial judge denied the motion as untimely and further explained that Bute had been appointed only for pretrial preparation. On May 2, 1985, McFarland filed a motion to continue Bute's representation through the trial. Consistent with the earlier rulings, the trial court denied this motion. Jury selection began on May 7, 1985. McFarland alone represented the defendant during the trial.

The defendant now argues that his right to counsel and his right to a public trial were violated when the trial court removed Bute from the case and "barred" Bute from the courtroom. We believe that the present contention simply rephrases one that this court considered and rejected on direct appeal: that the defendant was denied his right to effective assistance of counsel by the trial court's denial of his pretrial motion for substitution of counsel. See *Barrow*, 133 Ill. 2d at 250-55. Accordingly, the doctrine of *res judicata* bars the defendant from raising this argument here. See *Towns*, 182 Ill. 2d at 502.

This court rejected the defendant's argument on direct appeal. At that time, we held that the trial court

did not abuse its discretion in denying the defendant's request to substitute Bute as counsel of record. We reasoned that Bute might not have been able to cross-examine effectively some of the prosecution witnesses because of a conflict of interest, that the substitution would have delayed the trial, and that the defendant had offered no persuasive reasons for substituting counsel. *Barrow*, 133 Ill. 2d at 252. This court was not persuaded by the defendant's arguments that he was willing to waive his right to conflict-free counsel and that Bute was already familiar with the case. See *Barrow*, 133 Ill. 2d at 252-55. We explained that, although a defendant may waive his right to conflict-free counsel, a court is not required to accept such a waiver. *Barrow*, 133 Ill. 2d at 252-55, citing *Wheat v. United States*, 486 U.S. 153, 100 L. Ed. 2d 140, 108 S. Ct. 1692 (1988). We therefore concluded that, although the defendant waived his right to conflict-free counsel, the trial court appointed Bute only for pretrial purposes, presumably because the trial court believed that the potential conflict would not affect Bute's representation of defendant in matters concerning pretrial preparation. *Barrow*, 133 Ill. 2d at 254.

This court on direct appeal also rejected defendant's argument that the trial court's refusal to continue Bute's appointment into trial was improperly based on the trial court's erroneous conclusion that the county would have to pay for two lawyers. *Barrow*, 133 Ill. 2d at 254-55. We found that the defendant failed to show that he was prejudiced by McFarland's representation. *Barrow*, 133 Ill. 2d at 255. Specifically, we stated that the record revealed that the defendant received effective assistance of counsel throughout his trial, noting that McFarland "vigorously cross-examined witnesses, made numerous motions and posed objections when appropriate." *Barrow*, 133 Ill. 2d at 255.

The defendant argues that *res judicata* should not

bar our consideration of this issue because he has since discovered new evidence to support the claim. This court will relax the doctrine of *res judicata* when the evidence relating to the claim does not appear on the face of the original appellate record. See *People v. Hobley*, 182 Ill. 2d 404, 428 (1998). The defendant cites, as new evidence, an affidavit from Bute. In the affidavit, Bute states that his substitution as lead trial counsel would not have delayed defendant's trial. We do not agree with the defendant that this qualifies as a new fact. Before the trial judge, at the hearing on the motion to substitute Bute as trial counsel, McFarland argued that Bute should represent the defendant because of his "ultimate preparedness."

The defendant also contends that "it is now clear that Bute was not appointed merely for pretrial preparation." In support of that assertion, the defendant offers a number of documents. These include the State's January 29, 1985, motion to remove Bute from the case; the transcript of the hearing on the motion; a letter from McFarland to Bute, dated April 29, 1985, a week before the scheduled commencement of defendant's trial, regarding the need to discuss issues in the case; the defendant's letter to the trial judge, dated May 1, 1985, requesting that Bute remain on the case; and Bute's affidavit in support of the present post-conviction petition.

We do not consider any of this information to constitute new evidence that would warrant our relaxation of the doctrine of *res judicata*. The defendant does not argue that any of this information is newly discovered or was otherwise unavailable on direct appeal. Indeed, on direct appeal this court referred to the State's motion to remove Bute from the case and to the hearing on the motion.

The defendant further maintains that this court was mistaken on direct appeal when it reasoned that the trial court had refused to accept the defendant's waiver of conflict-free counsel. See *Barrow*, 133 Ill. 2d at 252-55.

Rather, the defendant asserts, the trial court accepted defendant's waiver when it denied the State's motion to remove Bute from the defendant's case. Again, the defendant cites proceedings that were part of the record on direct appeal, and he simply offers his interpretation of the original proceedings in support of the argument that "new facts" warrant our reconsideration of this issue. As this court has previously observed, " '[t]he Post-Conviction Hearing Act was not intended to be used as a device to obtain another hearing upon a claim of denial of constitutional rights where there has already been a full review of the issues raised ***. This is so, even though the present petition attempts to change the character of the questions previously advanced and decided, by describing them in different constitutional terms.' " *Emerson*, 153 Ill. 2d at 106, quoting *People v. Cox*, 34 Ill. 2d 66, 67-68 (1966).

On direct appeal, this court rejected the defendant's argument that he was denied his right to effective assistance of counsel by the trial court's denial of his motion for substitution of counsel prior to trial. See *Barrow*, 133 Ill. 2d at 250-55. The defendant now raises the same issue in arguing that his right to counsel was violated when the trial court "removed the attorney who had prepared the case [Daniel Bute]" and "excluded/barred" Bute from the courtroom. This issue is barred by *res judicata*. As a final matter, we reject the defendant's conclusory argument that "fundamental fairness" requires us to relax the doctrine of *res judicata* in this case.

## III

The defendant next argues that his constitutional right to due process was violated at trial because the State elicited false testimony from Harold "Smokey" Wrona regarding what promises were made to him in exchange for his testimony against defendant. The State's knowing use of perjured testimony to obtain a

criminal conviction violates due process. *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995). "A conviction obtained by the knowing use of perjured testimony must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict." *People v. Olinger*, 176 Ill. 2d 326, 345 (1997). The same principles also apply when the State, although not soliciting the false testimony, permits it to go uncorrected when it occurs. *Olinger*, 176 Ill. 2d at 345. This is so even when the false testimony concerns only that witness' credibility. *Olinger*, 176 Ill. 2d at 345.

On direct examination during the defendant's trial, Wrona testified that he did not make any agreements with Illinois authorities in exchange for his testimony. Wrona stated that the only agreement he had with law enforcement authorities was one that provided for his release from the Maryland prison. During the hearing on the defendant's motion for a new trial, the defendant's new attorney, J.D. Flood, who was substituted for trial counsel Wayne McFarland, informed the trial court that two pending felony charges against Wrona in Bureau County, Illinois, had been dismissed by the State by means of *nolle prosequi* orders. These orders were entered about three weeks after the defendant was sentenced in this case. The State has consistently maintained throughout the proceedings in this case that these felony charges against Wrona, one for theft, and the other for aggravated battery, filed in 1980, were dropped because witnesses were no longer available.

The defendant argues that the dismissal of the charges resulted from an agreement between Wrona and Illinois authorities. In support of this contention, the defendant cites a letter, dated April 16, 1985, approximately two weeks before trial, from McFarland to Dan Bute, the attorney who was appointed to assist McFarland in the defendant's case. In the letter, McFarland writes that a

Bureau County judge informed McFarland that, one year earlier, the Bureau County judge was "getting ready" to hear a case against Wrona but the case "disappeared." McFarland further wrote that the judge "advises me that he believes all pending causes against Mr. Wrona in La Salle County and Bureau County were to be dropped in exchange for Mr. Wrona's testimony in this case." The defendant also cites affidavits from two witnesses for the theft charge. These witnesses state that they were willing and available to testify against Wrona but that the Bureau County prosecutor's office never contacted them.

During the course of these proceedings, defendant filed a motion in this court for a limited remand to the circuit court for purposes of discovery in light of *People v. Olinger*, 176 Ill. 2d 326 (1997). In *Olinger*, the court held that the capital defendant in that case was entitled to an evidentiary hearing on his post-conviction claim that a critical prosecution witness had received an undisclosed multijurisdictional deal in exchange for the witness' testimony against the defendant. *Olinger*, 176 Ill. 2d at 342-52. In the present case, we allowed the defendant's motion for a limited remand to the circuit court for purposes of discovery in light of our decision in *Olinger*.

On remand, the circuit court permitted the defendant to take the depositions of three persons: the two La Salle County prosecutors from the defendant's trial in this case, and the Bureau County prosecutor who, after the defendant's trial, had dismissed the felony charges against Wrona. The circuit judge denied the defendant's requests for additional discovery and for a hearing on the question whether a multijurisdictional agreement existed. The circuit court then returned the cause to this court.

The defendant explains in a supplemental brief in this court that the three prosecutors stated during their depositions that they knew of no deals with Wrona that

involved dismissing Wrona's pending Bureau County charges. The defendant nonetheless points to what he calls "substantial inconsistencies" in the three depositions. The defendant has not supplemented the record in this court with the depositions. We hold that, in any event, the defendant has failed to show a reasonable likelihood that the allegedly false testimony by Wrona could have affected the jury's verdict. See *Olinger*, 176 Ill. 2d at 345.

Even if we assume that an agreement existed and that the State failed to disclose it, the substantial nature of the evidence against the defendant establishes that there is no reasonable likelihood that the allegedly false testimony could have affected the jury's verdict in this case. See *Olinger*, 176 Ill. 2d at 345. As we have already discussed in detail, the evidence of the defendant's guilt was overwhelming. A great deal of evidence placed the defendant in the vicinity of Cedar Point during the week preceding the victim's murder. Moreover, the record contains the defendant's own incriminating words describing his role in these offenses. The jury heard the recording of the defendant's conversation with Wrona in the Maryland hotel room. The defendant gave Wrona a detailed account of the crimes, providing information that only the offender could have known. The defendant told Wrona that "everything went just like *** we had planned it." The defendant explained that he had watched the victim's home for one week and that late one evening he forced his way into the residence. The defendant stated that although he hit the victim "all over," the victim would not tell defendant anything except "where he kept change." The defendant said that he searched everywhere but found only an empty safe in the basement. The basement was full of "garbage" and things like "sawhorses." The defendant also stated that he "pulled up" the first two stairs leading to the base-

ment but did not find any money there. The defendant said that the victim "kept saying, 'How do you know all this?'" The defendant said that he did get "a few fifty cent pieces I found on his bureau." Wrona asked the defendant what kind of gun he used, and the defendant replied that it was a "hot, nine mil[limeter]" from Delaware. When Wrona asked the defendant if the defendant had looked in the garage, the defendant replied that he did not because "I was worried once, you know, it happened, *** maybe the neighbors did hear something, you know. So we just *** rode out of there." The defendant told Wrona that when Bruce Barrow called the defendant from the police station after driving the wrong way down a one-way street in La Salle, the defendant worried because the "piece" was in the "glovebox." The defendant also told Wrona that he received a speeding ticket in Indiana, but that, at that point, he had already "tossed" the "piece" off a bridge into the water. In response to Wrona's questions about disposing of the "piece," the defendant stated, "That's the one good thing about it, they—they could put me out there, I imagine. But, *** they could never prove nothing."

Accordingly, even if Wrona did have an agreement with Illinois authorities, reversal of the defendant's convictions on that ground would not be warranted. Under the particular facts of this case, in light of the overwhelming evidence of guilt, we believe that the defendant has failed to show a reasonable likelihood that the alleged false testimony could have affected the jury's verdict. See *Olinger*, 176 Ill. 2d at 345.

## IV

The defendant next contends that the State violated his right to due process by failing to disclose to the defense all exculpatory evidence, as required by *Brady v. Maryland*, 373 U.S. 83, 10 L. Ed. 2d 215, 83 S. Ct. 1194 (1963). The defendant argues that the State violated the

*Brady* rule by failing to disclose information relating to the 1966 burglary of the victim's home, information about Wrona's criminal history, and the prior testimony of one of the State's witnesses.

To establish a *Brady* violation, the undisclosed evidence must be both favorable to the accused and material. Favorable evidence is material in this context " 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.' " *Coleman*, 183 Ill. 2d at 393, quoting *United States v. Bagley*, 473 U.S. 667, 682, 87 L. Ed. 2d 481, 494, 105 S. Ct. 3375, 3383 (1985). The materiality determination "turns on whether the '[g]overnment's evidentiary suppression "undermines confidence in the outcome of the trial," ' which *** 'is not a sufficiency of evidence test.' " *Coleman*, 183 Ill. 2d at 393, quoting *Kyles v. Whitley*, 514 U.S. 419, 434, 131 L. Ed. 2d 490, 506, 115 S. Ct. 1555, 1566 (1995), quoting *Bagley*, 473 U.S. at 678, 87 L. Ed. 2d at 491, 105 S. Ct. at 3381. The cumulative effect of all the suppressed evidence informs the materiality determination. *Kyles*, 514 U.S. at 436-37, 131 L. Ed. 2d at 507, 115 S. Ct. at 1567; *Coleman*, 183 Ill. 2d at 393.

The defendant first argues that the State failed to disclose information regarding the 1966 burglary of the victim's home. The defendant asserts that Wrona's credibility rested upon the fact that Wrona knew various details about the residence—details that the defendant had related to him. According to the defendant, if Wrona had participated in the 1966 burglary, the probative value of Wrona's testimony would have been correspondingly reduced. In testimony in this case before the grand jury and in pretrial motions, Herbert Klein, a captain at the La Salle County sheriff's department, testified that his office had considered Wrona a suspect in the 1966 burglary. After trial counsel filed a motion requesting the

investigative files of the 1966 burglary, the trial court ordered the State "to check with the sheriff and in their own files for what is or is not available concerning the prior O'Berto burglary."

During a pretrial suppression hearing, defense counsel asked Officer Klein whether his office maintained an investigative file on Wrona's suspected involvement in the 1966 burglary. The trial court sustained the State's objection to this question. Nevertheless, according to the defendant, the State was in possession of such an investigative file; as proof, the defendant refers to the testimony of the victim's daughter, when the prosecution introduced into evidence five crime scene photographs from the 1966 burglary. The defendant believes that the existence of those photographs suggests the existence of a file on the case. During these post-conviction proceedings, the defendant filed a motion for production of any investigative files from the 1966 burglary. The circuit court denied the motion.

The defendant further argues that the State violated *Brady* by failing to provide information regarding Wrona's criminal record. Prior to trial, defense counsel asked the State to produce Wrona's criminal record. At a pretrial hearing, the trial court asked the prosecutor if he had the "Illinois or FBI rap sheets" for Wrona. The prosecutor replied, "I don't have that right here." On the fourth day of trial, defense counsel again requested this information from the State. The prosecutor replied that he had made the request but had not received the information, and stated that he had "no control over the FBI." The defendant argues that Wrona's "rap sheets" were important because the defense had a right to investigate Wrona's alleged history as a police informant.

The defendant attaches to his amended post-conviction petition a letter to the defendant from an investigator for the Capital Resource Center; the letter

states that "a copy of Wrona's FBI sheet" had been found. The defendant has submitted this "rap sheet," which reveals that Wrona had numerous burglary and theft convictions. The defendant also attaches a summary of Wrona's criminal history; it is unclear who prepared this summary. The defendant also cites *People v. Wrona*, 7 Ill. App. 3d 1, 7 (1972), in which the appellate court characterized Wrona as a "habitual offender."

In this regard, the defendant also argues that trial counsel requested, in a motion for discovery, the reports of any police interviews with Wrona pertaining to this case. According to the trial testimony, police officers met with Wrona on three occasions for several hours and apparently discussed the defendant's case with him. The State reported to the trial court that no written reports regarding these meetings existed, and the defendant has not attached any reports like that to his post-conviction petition. The defendant further points out that, before trial began, the State told the judge that it had discovery available regarding telephone conversations between Wrona and his girlfriend, Judy Herron. The defendant's post-conviction petition alleges that the State never produced this information. The defendant does not attach the transcript of any such conversation to his post-conviction petition.

Finally, the defendant argues that the State failed to disclose the prior testimony of Walter Hamlin, who testified that he saw the defendant's brother, Bruce Barrow, at Hamlin's parents' restaurant in Cedar Point on the night of the murder. Trial counsel's motion for discovery requested any prior testimony offered by Hamlin. A few months before testifying at the defendant's trial, Hamlin had testified against defendant's brother in a case involving perjury charges that stemmed from the investigation in the present case, and the defendant has attached to his post-conviction petition a transcript of Hamlin's

testimony from the perjury trial. The defendant notes several differences between Hamlin's testimony in the perjury case and at trial here. For example, in the earlier proceeding Hamlin testified that he was in the presence of his brother when he saw a man whom he later identified as Bruce in the restaurant as early as 7 p.m., and he said that he did not know whether Bruce had a moustache. In the defendant's case, however, Hamlin testified that he was in the presence of a waitress when he saw Bruce in the restaurant, at 10 p.m., and that Bruce had a moustache. The defendant also appears to argue in this regard that the State failed to produce unidentified statements that certain witnesses made to a law enforcement officer.

The defendant contends that the State violated *Brady* by failing to disclose to the defense all the evidence described above, and that a new trial is therefore warranted. We find no basis for a new trial on this claim. Assuming, without deciding, that the evidence exists, the prosecution's failure to disclose it would not warrant a new trial, under the circumstances present here. The suppressed evidence must be material if it is to establish a *Brady* violation. In this context, evidence will be deemed material only if there exists a reasonable probability that the result of the proceeding would have been different if the evidence had been disclosed to the defense. See *People v. Hobley*, 182 Ill. 2d 404, 432 (1998). As discussed above, the evidence of defendant's guilt was overwhelming. In light of the overwhelming evidence of guilt in this case, we conclude that there is no reasonable probability that, even if all the allegedly suppressed evidence had been disclosed to the defense, the result of the defendant's trial would have been different.

## V

The defendant next argues that he is entitled to a new trial because he was receiving a psychotropic medica-

tion during the trial proceedings, and the trial judge never conducted a fitness hearing. We note that the first time that defendant raised this issue was in his motion for leave to file a "second *pro se* supplemental petition to amended petition for post-conviction relief," which the post-conviction court denied. The principle is well established that a defendant waives a post-conviction issue if the issue is not raised in the original or amended post-conviction petition. *People v. Johnson*, 154 Ill. 2d 227, 233 (1993); see 725 ILCS 5/122—3 (West 1998) ("[a]ny claim of substantial denial of constitutional rights not raised in the original or an amended petition is waived"). The defendant also failed to raise this issue on direct appeal. Although we would generally conclude that this issue has been procedurally defaulted, we will address it in this appeal, in light of the absence of a brief—and an argument for waiver—by the State.

The defendant argues that the absence of a fitness hearing deprived him of due process, and that his trial counsel was ineffective for failing to request a fitness hearing. The statute in effect at the time of defendant's trial, section 104—21(a) of the Code of Criminal Procedure of 1963, provided that "[a] defendant who is receiving psychotropic drugs or other medications under medical direction is entitled to a hearing on the issue of his fitness while under medication." Ill. Rev. Stat. 1985, ch. 38, par. 104—21(a). The defendant's medical records from the La Salle County Correctional Center show that he was ingesting Adapin during the trial proceedings. Adapin, also known as Sinequan and doxepin, is considered a psychotropic drug. See 405 ILCS 5/1—121.1 (West 1996); Physicians' Desk Reference 112, 2407 (53d ed. 1999); AMA Drug Evaluations 144 (6th ed. 1986).

In the wake of this court's recent decision in *People v. Mitchell*, 189 Ill. 2d 312 (2000), we must reject the defendant's argument that the failure to hold a fitness

hearing under section 104—21(a) denied him due process and may serve as a basis for post-conviction relief. In *Mitchell*, an appeal in a post-conviction case, this court held that a defendant's right to a hearing under section 104—21(a) is purely statutory. Because post-conviction proceedings are limited to allegations of constitutional deprivations, the *Mitchell* court concluded that the denial of a hearing under that provision cannot serve as a basis for post-conviction relief. *Mitchell*, 189 Ill. 2d at 329. For these reasons, we must hold in the present case that the defendant's contention that he was entitled to a fitness hearing under section 104—21(a) cannot provide a basis for post-conviction relief.

The defendant makes the further argument, however, that he was denied the constitutional right to the effective assistance of counsel by his trial lawyer's failure to invoke the provisions of section 104—21(a). This contention has a constitutional basis and therefore is cognizable in a post-conviction proceeding. See *Mitchell*, 189 Ill. 2d at 337-38. As we discussed earlier in this opinion, a defendant raising a claim of ineffective assistance of counsel must show both that counsel's performance was deficient and that the defendant was prejudiced by the asserted deficiency. *Strickland v. Washington*, 466 U.S. 668, 687, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984). Applying the *Strickland* test for prejudice in the context of a claim of ineffective assistance of counsel for failure to seek a hearing under section 104—21(a), *Mitchell* held that a defendant in those circumstances must show that there is a reasonable probability that he would have been found unfit if counsel had requested a fitness hearing. *Mitchell*, 189 Ill. 2d at 334. We do not believe that the defendant has satisfied that standard. A defendant is considered unfit for trial "if, because of his mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist

in his defense." 725 ILCS 5/104—10 (West 1998). The medication log sheet for the defendant from the La Salle County Correctional Center shows that he was receiving Adapin daily from November 6, 1984, until June 10, 1985. The defendant has failed, however, to present any evidence to show a reasonable probability that he would have been found unfit for trial if counsel had requested a fitness hearing under the statute. It appears that the defendant was taking the drug for anxiety, headaches, and stomachaches. The defendant has not provided any further information in support of this contention. We therefore conclude that he has failed to establish a reasonable probability that he would have been found unfit if counsel had requested a hearing.

## VI

As noted above, this court allowed the defendant to file a *pro se* "supplemental" appellate brief. Although a defendant does not have the right to both self-representation and the assistance of counsel (*People v. McDonald*, 168 Ill. 2d 420, 435 (1995)), we will in this case, as we have in other capital cases, consider the arguments raised in the defendant's *pro se* brief. See *People v. Emerson*, 189 Ill. 2d 436, 516-17 (2000); *McDonald*, 168 Ill. 2d at 435; *People v. Gacy*, 125 Ill. 2d 117, 133-34 (1988). Although most of the issues raised by the defendant in his *pro se* brief duplicate issues raised by counsel, we will address the defendant's distinct contention that he is actually innocent of the crimes for which he was convicted in this case.

In *People v. Washington*, 171 Ill. 2d 475, 489 (1996), this court held that a post-conviction petitioner may pursue a free-standing claim of actual innocence based on newly discovered evidence. To win relief under that theory, the supporting evidence must be new, material, and noncumulative, and it must be of such conclusive character that it would probably change the result on

retrial. *Washington*, 171 Ill. 2d at 489. Newly discovered evidence must be evidence that was not available at defendant's trial and that the defendant could not have discovered sooner through diligence. *People v. Burrows*, 172 Ill. 2d 169, 180 (1996).

In support of the present argument, the defendant has attached affidavits from David and Cheryl Stevenson, who identify themselves as friends of Harold "Smokey" Wrona. David Stevenson states in his affidavit that Wrona told him, in April 1988, that Wrona lied at the defendant's trial to get out of prison and that the person who actually committed the crimes involved here was Wrona's friend. Cheryl Stevenson, in her affidavit, states that she overheard Wrona tell David this information.

We hold that the Stevensons' affidavits are not of such conclusive character that the testimony would likely change the result of the defendant's trial. Again, the evidence against the defendant was "overwhelming," as this court noted on direct review (*Barrow*, 133 Ill. 2d at 249-50), and as we have previously stated in this opinion. The testimony at trial conclusively placed defendant near the scene of the crime at the time of its commission. In addition, the evidence included a tape-recorded conversation between defendant and Wrona in which the defendant implicated himself in these crimes. Regardless of Wrona's testimony, the jury heard defendant, in his own words, describe the commission of the offenses. We therefore hold that the Stevensons' affidavits are not of such conclusive character that they would likely change the outcome of defendant's trial.

\* \* \*

For the reasons stated, the judgment of the circuit court of La Salle County is affirmed. The clerk of this court is directed to enter an order setting Tuesday, May 15, 2001, as the date on which the sentence of death,

entered in the circuit court of La Salle County, is to be carried out. The defendant shall be executed in the manner provided by law. 725 ILCS 5/119—5 (West 1998). The clerk of this court shall send a certified copy of the mandate in this case to the Director of Corrections, to the warden of Tamms Correctional Center, and to the warden of the institution where the defendant is now confined.

*Judgment affirmed.*

JUSTICE FREEMAN, concurring:

I concur in the court's decision. I write separately only to express my reason for no longer adhering to the rationale of the dissent which I authored in *People v. Mitchell*, 189 Ill. 2d 312, 362 (2000) (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.).

In the wake of *Mitchell*, this court issued a series of opinions in which the law as set forth in *Mitchell* was applied. See *People v. Moore*, 189 Ill. 2d 521 (2000); *People v. Jones*, 191 Ill. 2d 194 (2000); *People v. Holman*, 191 Ill. 2d 204 (2000); *People v. Jones*, 191 Ill. 2d 354 (2000). I dissented in these cases, not only because I disagreed with *Mitchell*, but because I believed that the court unfairly denied those defendants the opportunity to rebrief the matter in light of the new principles set forth in *Mitchell*. Notwithstanding my dissents, our psychotropic drug jurisprudence remains the same today as it was on the day *Mitchell* was announced.

The present case necessitates this court to once again revisit the area of psychotropic drugs. The conclusion reached today is consistent with *Mitchell* and all of the aforementioned decisions which postdated *Mitchell*. Those of us who, in the past, have disagreed with that conclusion have voiced our dissent. I, having done so, now believe that it is my obligation to accept the law as pronounced by the court.

In my dissent in *Mitchell*, I emphasized the need for

the consistent application of legal principles and rules in similar cases: "The law of this court cannot be seen by the bar and the public to be one that is constantly 'in flux,' changing from opinion to opinion, particularly in capital cases." *Mitchell*, 189 Ill. 2d at 395 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.). A year has passed since the announcement of *Mitchell*. During that time, the law announced in *Mitchell* has not changed. The only change that has occurred is that three members of the court who joined in the majority have left, and three new justices have taken their place. In light of this fact, I believe that my continued opposition in this area does little good and goes against the very principles of *stare decisis* that I cited in my original dissent. Not one circumstance has changed in our psychotropic drug jurisprudence since the court announced *Mitchell*, except for the fact of the above-noted change in court personnel. As I noted in my dissent in *Mitchell*, "this type of 'circumstance' does not rise to the level necessary to overturn the doctrine of *stare decisis*." *Mitchell*, 189 Ill. 2d at 398 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.). In this situation, I believe that the words of Justice Ryan, quoted in my dissent in *Mitchell*, are particularly apt: " '[i]f the law were to change with each change in the makeup of the court, then the concept that ours is a government of law and not of men would be nothing more than a pious cliche.' " *Mitchell*, 189 Ill. 2d at 366 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow J.), quoting *People v. Lewis*, 88 Ill. 2d 129, 167 (1981) (Ryan, J, concurring).

For this reason, although I authored the dissent in *Mitchell*, I concur in the opinion and judgment of the court in this case.

CHIEF JUSTICE HARRISON, concurring in part and dissenting in part:

I agree that Barrow's convictions should not be disturbed. In my view, however, his sentence of death cannot be allowed to stand. For the reasons set forth in my partial concurrence and partial dissent in *People v. Bull*, 185 Ill. 2d 179 (1998), the Illinois death penalty law violates the eighth and fourteenth amendments to the United States Constitution (U.S. Const., amends. VIII, XIV) and article I, section 2, of the Illinois Constitution (Ill. Const. 1970, art. I, § 2). Barrow's sentence of death should therefore be vacated, and the cause should be remanded to the circuit court for imposition of a sentence of imprisonment. Ill. Rev. Stat. 1983, ch. 38, par. 9—1(j).

JUSTICE McMORROW, dissenting:

Defendant contends that he is entitled to a new trial because he was receiving psychotropic medication during his trial proceedings. Applying the principles of *People v. Mitchell*, 189 Ill. 2d 312 (2000), the majority rejects this claim. See 195 Ill. 2d at 538-40.

I disagreed with the result reached by a majority of this court in *Mitchell* (see *Mitchell*, 189 Ill. 2d at 362 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.)), and I continue to believe that *Mitchell* was wrongly decided. See *People v. Jones*, 191 Ill. 2d 354, 361 (2000) (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.); *People v. Jones*, 191 Ill. 2d 194, 202-03 (2000) (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.); *People v. Moore*, 189 Ill. 2d 521, 546 (2000) (Freeman, J., dissenting, joined by McMorrow, J.). I would therefore resolve defendant's claim regarding psychotropic medication on the basis of the law as it stood prior to *Mitchell*. See *Mitchell*, 189 Ill. 2d at 396 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.); *Jones*, 191 Ill. 2d at 362 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow,

J.); *Jones*, 191 Ill. 2d at 202-03 (Freeman, J., dissenting, joined by Harrison, C.J., and McMorrow, J.). For these reasons, I respectfully dissent.