NOTICE

Decision filed 04/20/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 180207-U

NO. 5-18-0207

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 14-CF-262 |
| | ) | |
| BETHANY PLEASANT, | ) | Honorable |
| | ) | William G. Schwartz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE CATES delivered the judgment of the court.
Presiding Justice Boie and Justice Barberis concurred in the judgment.

**ORDER**

¶ 1    *Held*: The circuit court's dismissal of the defendant's *pro se* postconviction petition at the first stage of proceedings is affirmed because the defendant failed to plead the gist of a constitutional claim alleging that she received ineffective assistance of counsel.

¶ 2    The defendant, Bethany Pleasant, appeals the circuit court's dismissal of her *pro se* postconviction petition. On appeal, the defendant claims that the circuit court erred in dismissing the defendant's petition because she pled the gist of a constitutional claim alleging that she received ineffective assistance of counsel. Specifically, the defendant argues that counsel was arguably ineffective for not calling witnesses or presenting evidence at sentencing to corroborate the defendant's assertion that she was a victim of

1

domestic violence and that the defendant was arguably prejudiced by counsel's alleged deficient performance. For the following reasons, we affirm the circuit court's order dismissing the defendant's *pro se* postconviction petition.

¶ 3                                  I. BACKGROUND

¶ 4      On June 19, 2014, the defendant was charged by information with one count of predatory criminal sexual assault of a child (720 ILCS 5/11-1.40(a)(1) (West 2014) (count I) and one count of criminal sexual assault (720 ILCS 5/11-1.20(a)(4) (West 2014) (count II). Count I alleged that the defendant, who was 17 years of age or older, committed an act of sexual penetration with R.P., who was under 13 years of age, in that the defendant placed her mouth on the penis of R.P. Count II alleged that the defendant, who was 17 years of age or older and held a position of trust, authority, or supervision in relation to the victim, committed an act of sexual penetration with R.P., who was at least 13 years old but under the age of 18. The alleged abuse occurred between the years 2010 and 2011. The charges against the defendant in this case stemmed from an initial investigation involving allegations of criminal sexual assault made against the defendant's husband, Robert Pleasant, by S.P. and R.P., his children from a previous marriage. During the investigation, S.P. and R.P. made additional allegations of criminal sexual assault against the defendant.

¶ 5      On November 13, 2014, the defendant entered a plea of guilty to count II. In exchange for her plea of guilty to count II, the State agreed to dismiss count I and not file any additional charges against the defendant. Additionally, count II was amended to add the language "in that the defendant performed fellatio upon R.P." The parties made no sentencing agreement in exchange for the defendant's plea of guilty.

2

¶ 6    Prior to the defendant's sentencing, a presentence investigation report (PSI) containing information concerning the defendant's offense and her background was completed. According to the PSI, the defendant described her mental health as stable but reported that she had experienced stress, anxiety, and depression stemming from her relationship with Robert. The defendant believed she suffered from posttraumatic stress disorder (PTSD) and battered wife syndrome. She claimed that she inquired with her counsel about obtaining a mental health evaluation but was advised that "typically, inmates that are not involved in a jury trial are not granted an evaluation." She stated her attorney advised her that counseling services could be arranged; however, the defendant would have to pay for the associated costs. The defendant indicated she did not have funding to pay for counseling services.

¶ 7    A written statement from the defendant was also attached to the PSI. In her statement, the defendant stated that she would not have committed her offense had she not met Robert. The defendant described Robert as manipulative and controlling, as well as verbally, mentally, and physically abusive. The defendant claimed she had plans to leave Robert but "certain circumstances *** such as fear and entrapment" hindered the defendant's ability to do so.

¶ 8    On February 2, 2015, the parties appeared for sentencing. The State introduced a victim impact statement from Elizabeth Smith, Robert's ex-wife and the mother of S.P. and R.P.; seven videos; two photographs depicting the defendant, who appears to be smiling or laughing, digitally penetrating S.P.; and the testimony of the PSI writer and Detective Michael Laughland.

3

¶ 9    The first video introduced by the State depicted a large marijuana-growing operation in the basement of Robert and the defendant. The video was filmed by the defendant. The second video was filmed by Robert and showed the defendant tied up on the floor. S.P. and R.P. were also in the video. Robert made several lewd comments and everyone, including the defendant, appeared to be smiling and laughing. The third video was of Robert and his ex-girlfriend, Armanda Gordon, having sex. The defendant filmed this video and touched both Robert's and Gordon's genitalia. In this video, Robert also stated that he had sex with Gordon when she was 16 years old. The next two videos consisted of one continuous event. These two videos portrayed the defendant having sex with her father-in-law. In the videos, the defendant and her father-in-law discussed impregnating the defendant because she and Robert wanted to have a baby.[1] During this video, the defendant also sent Robert text messages to update him on what was happening. At the end of the second video, the defendant looked at the camera and said, "Here's your video baby, I hope you like it because I did. *** See you when you get home baby, I love you." The last two videos were also filmed by the defendant. In these videos, Robert appears to be watering trees, and the defendant stated that their house was starting to look like home.

¶ 10    For the defense, the defendant testified on her own behalf and introduced several police reports. The reports introduced by the defendant contained law enforcement interviews with R.P., S.P., Smith, and Gordon. These police reports detailed the

[1]The record indicates that the defendant was unable to get pregnant with Robert because he previously had a vasectomy.

defendant's offense as well as the abuse Robert inflicted on his children, Smith, Gordon, and the defendant.

¶ 11 The first police report documented a domestic violence incident which occurred between the defendant and Robert on March 25, 2012. At the time of the report, the defendant had not yet married Robert. The report indicated that the defendant ran to a neighbor's house and asked the neighbor to call the police because the defendant and Robert were fighting. The defendant did not have her phone with her. The police officers who responded observed marks on the defendant's neck and lower jaw. Robert admitted to putting his hands around the defendant's neck but claimed he did not do so in a violent manner. The defendant declined to sign a complaint against Robert and gathered her belongings before leaving in her car that evening. The report also noted that Robert had an expired order of protection from a previous relationship.

¶ 12 The next report contained R.P.'s interview with investigators. R.P. reported that, when he was 12 years old, his father would talk to him about letting the defendant perform oral sex on R.P., stating that "family's [*sic*] share." Approximately one month later, R.P. was playing outside with Robert and the defendant. They then went inside and "piled on the bed." R.P. remembered Robert talking to the defendant but could not hear the conversation. Robert then walked into a closet, and the defendant performed oral sex on R.P. He could not remember if the defendant pulled off his pants or instructed him to pull down his pants. After a few minutes, R.P. told the defendant to stop, and the defendant got up from the bed and walked into the closet. Robert exited the closet and looked disappointed. R.P. recounted that the defendant continued to perform oral sex on him

approximately every other time he went to Robert's house for visitation. On one occasion, Robert instructed R.P. to insert a "dildo" into the defendant's vagina, and R.P. complied. These incidents occurred both when Robert was home and while he was away at work. Generally, the defendant and Robert instigated the sexual acts between R.P. and the defendant. R.P. admitted, however, that he sometimes initiated sexual contact with the defendant to make Robert proud. Finally, R.P. told investigators that he recalled Robert being violent with the defendant on one occasion but did not elaborate. According to R.P., S.P. no longer wanted to visit Robert after he was violent with the defendant.

¶ 13    The defendant also introduced two reports which consisted of the investigators' interviews with S.P. In her interviews, S.P. disclosed that Robert began touching her when she was eight years old. S.P. indicated that the touching progressed to sexual intercourse as S.P. got older. If S.P. protested or told Robert to stop, he would get angry and break things. He also gave S.P. drugs or alcohol, which she occasionally accepted "to help deaden her perception" of the sexual abuse. S.P. told investigators that Robert also forced her to have sex with a stranger in a bathroom for money. S.P. added that Robert was extremely violent with Gordon. S.P. stated that Robert forced Gordon to perform oral sex and use sex toys on S.P. She stated Gordon did not willingly participate in the sexual acts with S.P. and never engaged S.P. sexually when Robert was not home. S.P. also disclosed that Robert abused Gordon's daughter, H.P. When discussing the defendant, S.P. recalled the defendant being present when Robert was having sexual intercourse with S.P. She stated that Robert encouraged S.P. to have sexual contact with the defendant. S.P. reported that

6

she and the defendant touched each other's genitals. S.P. conveyed that the defendant appeared to enjoy the sexual acts with S.P.

¶ 14    The next report covered Gordon's interview with investigators. Gordon reported that Robert was extremely violent and would sexually torture her. She told investigators that Robert choked her with a belt; gave her "ice water enemas" before having anal sex, without letting her pass the enema first; forced her to watch pornography for hours; and tied her up for several hours, beating her with a belt if she moved. Robert also forced Gordon to engage in sexual acts with both S.P. and H.P. Robert took photographs of these incidents. When Gordon protested engaging in sexual acts with the minors, Robert would hit her. Gordon informed investigators that she attempted to leave Robert several times. After leaving one time, Robert found Gordon three days later. Robert held Gordon's head under water and urinated on her. Robert threatened to kill Gordon and H.P. if Gordon ever tried to leave again. Robert also threatened to show people the photographs he took of Gordon with S.P. and H.P. Finally, Gordon told investigators that she and Robert smoked marijuana on a regular basis, used methamphetamine three times, and used acid one time. Robert also provided Gordon with Xanax.

¶ 15    The final report contained the investigator's interview with Smith, Robert's ex-wife. She stated Robert was a violent person. He would kick, hit, bite, and hold Smith down. Occasionally, Robert put a plastic bag over Smith's head until she passed out. Robert was also sexually violent with Smith, who indicated that she engaged in sexual acts with others to make Robert happy. Smith also indicated that Robert raped her toward the end of their

marriage and told Smith to call the police if she wanted. Robert claimed that he "got off" on a previous charge because he had a girlfriend on the jury.

¶ 16   In her testimony, the defendant testified that Robert was her first "real relationship." The defendant met Robert when he approached her at a gas station. On a later date, he came to the defendant's work after she completed her shift and told the defendant that they could "ride around" and "get to know each other better." Instead, Robert drove the defendant to his house. The defendant claimed she did not agree to go to Robert's house and was "startled." Robert told the defendant that he had to check on his children. This comforted the defendant and she agreed to go to Robert's house. Robert's children, however, were not at his house. Subsequently, the defendant began dating Robert and moved in with him. The defendant alleged that she moved in with Robert after her car broke down because Robert told the defendant that he would eventually help the defendant fix her car. While she lived with Robert, the defendant claimed that she did not have a working vehicle or access to Robert's car. The defendant also claimed that she did not consistently have a phone because she could not afford one. Robert occasionally bought the defendant a phone but would break the phones when he was angry with the defendant. The defendant testified that Robert did not allow her to get a job or leave the house without his permission. Occasionally, Robert allowed the defendant to work with his mother who paid the defendant "under the table."

¶ 17   The defendant then testified about Robert's abusive nature. The defendant stated that Robert was easily angered and that she "couldn't do anything right." The defendant indicated that Robert would "beat" her at least twice a month. If the defendant stood up to

8

Robert, she would get hit. She alleged that Robert grabbed her hair; hit her in the face, stomach, liver, and kidneys; and threw her to the floor and choked her, often until the defendant lost consciousness. During two of the episodes with Robert, the defendant separated her shoulder, which required surgery. When choking the defendant, Robert often threatened to kill her. At times, the defendant told Robert to kill her. When she regained consciousness, the defendant claimed she was disappointed and afraid. She alleged that Robert would be breathing heavy and looked enraged. The defendant also testified that Robert held plastic bags or his hand over the defendant's mouth until Robert decided to let her go or she was able to "buck him off." Robert called this the "no breathing game." When S.P. and R.P. were visiting Robert, he told the defendant to not appear upset with him. In addition to abusing the defendant, Robert often bragged about abusing Gordon, claiming he broke her nose and jaw. When asked why she did not leave Robert after the March 25, 2012, domestic violence incident, the defendant alleged she did not have a stable place to go or money to support herself. The defendant stated Robert also called her and promised "things would be different."

¶ 18 Counsel then questioned the defendant about the sexual acts with S.P. and R.P. The defendant admitted to the incident with S.P. but denied initiating it. The defendant alleged that she was intoxicated during the incident because Robert gave Xanax and alcohol to the defendant and S.P. The defendant stated she ingested the substances because Robert threatened her. The defendant asserted that she did not enjoy the sexual acts with S.P., but Robert told her "to put on a good act." The defendant also alleged that Robert initiated the sexual contact between the defendant and R.P. The defendant admitted to performing oral

9

sex on R.P. one time and the incident between R.P. and the defendant involving a "dildo." The defendant asserted that she did not want to be involved in the sex acts but complied because of Robert's abuse. The defendant denied any other sexual acts with R.P. that were alleged.

¶ 19 The defendant testified that she did not go to the police because she was afraid Robert would kill her. The defendant also stated that Robert told the defendant, "Why do you think I took the video for it in the first place? That way, whenever you go to the police, I'm taking you with me." The defendant indicated that she decided to plead guilty rather than go to trial because she did not want to put the children through a trial.

¶ 20 The defendant was also questioned about the videos introduced by the State. The defendant asserted that she did not want to have sex with her father-in-law or get pregnant by him. The defendant alleged that it was one of Robert's fantasies and insisted that Robert forced the defendant to participate. The defendant also contended her speech was slurred in the videos of Robert watering trees. The defendant testified that Robert forced her to take Xanax before filming by wrestling her to the ground and forcing the pills into her mouth. Finally, the defendant insisted she was "shocked" when she heard Robert say that he had sex with Gordon when she was 16 years old. The defendant did not stop the video and leave because she assumed Robert would get angry and physical with her.

¶ 21 Following the evidence, the circuit court allowed the defendant to make a statement. In her statement, the defendant expressed remorse and apologized to the victims. The circuit court then heard arguments from the parties regarding an appropriate sentence. In arguing for the minimum sentence, defense counsel argued that the police reports

10

corroborated the defendant's contention that she was abused by Robert and forced to participate in the sexual acts. Counsel pointed out that R.P. witnessed Robert abuse the defendant and that both Gordon and Smith reported Robert had abused them. Counsel added, "All those women had to get out of that relationship, and they didn't get out immediately. It took them awhile. [The defendant] is in the same boat. It takes awhile to get out of these relationships." Counsel also argued that the following statutory factors in mitigation applied to the defendant's case: (1) the defendant acted under strong provocation; (2) substantial grounds excused or justified the defendant's conduct; and (3) the defendant's conduct was induced by another.

¶ 22    The circuit court acknowledged that the defendant was a victim and referred to Robert as a "preyer [*sic*]" and a "sick person." The circuit court then recognized that the defendant was also a perpetrator and criticized her for her participation in the sexual acts. Before imposing sentence, the circuit court determined that the defendant deserved credit for not forcing the children through a trial but stated the defendant needed "to be dealt with severely." The circuit court sentenced the defendant to 12 years in the Illinois Department of Corrections (IDOC) followed by a mandatory supervised release period of 3 years to life, a determination to be made by IDOC. The circuit court indicated that the defendant did not receive the maximum penalty of 15 years because the defendant did not force S.P. and R.P. to go through a trial.

¶ 23    On February 26, 2015, the defendant filed a motion to reconsider and reduce sentence arguing that the circuit court failed to consider statutory mitigating factors including: (1) the defendant acted under strong provocation; (2) substantial grounds

excused the defendant's behavior which did not establish a defense; (3) the defendant's criminal conduct was induced by someone other than the defendant; (4) the defendant's lack of criminal history; (5) the circumstances that led to the offense were unlikely to recur; and (6) the defendant's character and attitude indicated she was unlikely to reoffend. The defendant requested that her sentence be reduced from 12 years to 8 years. The circuit court denied the defendant's motion indicating that it had considered the factors during sentencing and determined the sentence was appropriate in light of the facts of the case and arguments in aggravation and mitigation. The defendant did not file a direct appeal of her conviction and sentence.

¶ 24    On January 5, 2018, the defendant filed a "Petition for Relief from Judgment" seeking relief pursuant to section 2-1401 of the Code of Civil Procedure (735 ILCS 5/2-1401 (West 2016)) and a motion for appointment of counsel. In this petition, the defendant provided a list of evidence which was allegedly withheld from the circuit court. The list included, *inter alia*, witness statements and records regarding the domestic violence suffered by the defendant as well as statements regarding the defendant's character. Attached to the defendant's petition were two letters and medical records from IDOC. The IDOC medical records revealed that the defendant had been diagnosed, on September 4, 2015, with generalized anxiety disorder and PTSD.

¶ 25    The first letter the defendant provided was from Barbara Steffens, the grandmother of the defendant's friend, Kayla. In her letter, Steffens recounted that the defendant and Kayla were close friends. Steffens stated that she and her husband were the defendant's "unofficial grandma and papa." Steffens indicated that she never met Robert but stated he

12

isolated and abused the defendant. Steffens recalled the defendant calling Kayla several times during the defendant's relationship with Robert. When Kayla was not home, Steffens spoke with the defendant, who sounded nervous and anxious. Steffens stated that the defendant emphasized that Kayla could not call her back. The last time the defendant called Kayla, the defendant left a message stating that the defendant "*really* needed to talk" to Kayla. (Emphasis in original.) Kayla attempted to return the defendant's call, but the first two calls went straight to voice mail. A third call indicated the phone number was no longer in service. Steffens remarked that, if she knew "what [the defendant] was going through," then Steffens "would have gotten the defendant out of there." Steffens wrote that she would be willing to testify on the defendant's behalf.

¶ 26 The second letter was from Kevin Young, one of Robert's coworkers. Young stated that Robert only let his coworkers know the defendant's first name. When Young met the defendant, she appeared timid and afraid to speak. Young added that the defendant stood behind Robert. After their first meeting, Young stated that the defendant did not come into the office again and always remained outside in the vehicle. Young claimed that he and the defendant developed a friendship when she called Robert's work at night to check in with Robert or pass along a message to him. Young described himself as a "close friend" and indicated that he visited the defendant while she was incarcerated. Young's letter also recounted the abuse by Robert that the defendant disclosed to Young. Young wrote that he would be willing to testify on the defendant's behalf.

¶ 27 On January 26, 2018, the State filed a motion to dismiss the defendant's petition for relief from judgment arguing that the petition was untimely because it had been filed after

13

the two-year filing period. The State further argued that the defendant failed to state a claim which would have precluded entry of judgment. The State explained that the defendant's claims only related to the factors she believed the circuit court could have considered in mitigation of her sentence.

¶ 28    On January 30, 2018, the defendant mailed a "Pro Se Post-Conviction Petition" accompanied by a motion for appointment of counsel. In her *pro se* postconviction petition, the defendant alleged that her counsel was ineffective for failing to: (1) submit supporting statements on the defendant's behalf; (2) call witnesses to testify on the defendant's behalf; (3) present "critical support showing the pattern of [d]omestic [v]iolence and harm done to [the defendant]"; and (4) raise several mitigating factors at sentencing. The defendant also alleged that she was denied due process because her attorney failed to present a defense of domestic abuse. The defendant did not attach supporting documentation to this pleading.

¶ 29    On February 21, 2018, the circuit court denied the defendant's *pro se* postconviction petition finding that the petition was frivolous and without a constitutional basis. In its order, the circuit court indicated that defendant's counsel "did an excellent job of presenting the factors in mitigation and emphasizing the salient points with respect to his client." The circuit court stated that during the time between the defendant's plea and sentence, the defendant did not have any supporting letters submitted on her behalf. The circuit court also stated the defendant did not inform the probation officer preparing the PSI to contact individuals regarding the defendant's sentencing. In denying her claim of ineffective assistance of counsel, the court found, "[The defendant's] statement in the pre-sentence investigation contains many of the points she now presents in her Post-Conviction

14

Petition. The question must be asked: What supporting statements; what witnesses; and, what evidence?"

¶ 30   In denying the defendant's due process claim, the circuit court found that the defense of domestic abuse was irrelevant because the defendant did not go to trial. The circuit court noted that domestic abuse was presented as a mitigating factor during the sentencing hearing. The circuit court added that the defendant had not presented anything that the court had not already considered and, "most importantly, nothing that amounts to a Constitutional violation." The same day, the circuit court denied the defendant's petition for relief from judgment. The circuit court found that the petition for relief from judgment was untimely and that the defendant failed to state a claim for which relief can be granted. This appeal followed.

¶ 31                                    II. ANALYSIS

¶ 32   On appeal, the defendant challenges the denial of her postconviction petition alleging ineffective assistance of counsel. The Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2018)) provides a mechanism by which a defendant may challenge their convictions or sentences for violations of the state or federal constitution. *People v. Barrow*, 195 Ill. 2d 506, 518-19 (2001). The Act establishes a three-stage procedure for adjudicating a defendant's postconviction petition. *People v. Jones*, 213 Ill. 2d 498, 503 (2004). At the first stage, the circuit court must independently review the petition, without input from the State, and determine whether the petition is frivolous or patently without merit. *People v. Turner*, 2012 IL App (2d) 100819, ¶ 18. A petition is frivolous or patently without merit if the petition has no arguable basis in law or in fact.

15

*People v. Hodges*, 234 Ill. 2d 1, 16 (2009). "A petition lacks an arguable basis in law or fact if it is 'based on an indisputably meritless legal theory,' such as one that is 'completely contradicted by the record,' or 'a fanciful allegation,' including 'those which are fantastic or delusional.' " *People v. Scott*, 2011 IL App (1st) 100122, ¶ 22 (quoting *Hodges*, 234, Ill. 2d at 16-17).

¶ 33    A postconviction petition survives first-stage proceedings if the petition sets forth the gist of a constitutional claim. *Hodges*, 234 Ill. 2d at 9. The threshold for survival in the first stage is low because most petitions are drafted by defendants with little legal knowledge or training. *Hodges*, 234 Ill. 2d at 9. At the first stage, we must accept as true all facts alleged in the postconviction petition, unless the record contradicts those allegations. *People v. Coleman*, 183 Ill. 2d 366, 385 (1998). Thus, the circuit court must docket the defendant's postconviction petition for further proceedings under the Act if any claim in the postconviction petition contains statements that, if true, would establish the gist of a constitutional claim. *People v. Rivera*, 198 Ill. 2d 364, 371 (2001). We review the circuit court's dismissal of a defendant's postconviction petition *de novo*. *Hodges*, 234 Ill. 2d at 9.

¶ 34    In determining whether the defendant has asserted an arguable claim of ineffective assistance of counsel, we are guided by the two-prong analysis set forth in *Strickland v. Washington*, 466 U.S. 668 (1984), for determining whether the defendant received ineffective assistance of counsel. *Hodges*, 234 Ill. 2d at 17. Under *Strickland*, a defendant must show that counsel's performance fell below an objective standard of reasonableness, and that counsel's deficient performance prejudiced the defendant. *Strickland*, 466 U.S. at

687-88. At the first stage of postconviction proceedings, the circuit court may not summarily dismiss a petition alleging ineffective assistance of counsel if it is arguable that counsel's performance fell below an objective standard of reasonableness, and it is arguable that the defendant was prejudiced. *Hodges*, 234 Ill. 2d at 17.

¶ 35 Here, the defendant argues that she pled the gist of a constitutional claim in alleging that her counsel provided ineffective assistance at sentencing by failing to call witnesses or present statements to corroborate the defendant's contention that she was a victim of domestic violence. The record, however, reveals that the defendant's claim is meritless. In addition to the defendant's testimony at sentencing, counsel introduced several police reports, which contained statements concerning the horrific physical, mental, and sexual abuse Robert inflicted upon his ex-wife, ex-girlfriend, and his own children. Most importantly, the police reports also showed that the defendant, herself, suffered domestic abuse at the hands of Robert. Counsel introduced one report in which officers responded to a domestic incident between the defendant and Robert. The responding officers noticed red marks on the defendant's neck and lower jaw, and Robert admitted to putting his hands around the defendant's neck. Another report indicated that R.P. witnessed Robert abuse the defendant.

¶ 36 We note that the defendant's *pro se* postconviction petition did not state what witnesses counsel could have called or what statements counsel failed to present. On appeal, the defendant points to the Steffens and Young letters as well as the IDOC medical records attached to the defendant's petition for relief from judgment. The defendant suggests that either the testimony of Steffens and Young or their letters could have shown

17

Robert's controlling behavior and how he isolated the defendant from her family and friends. The defendant also submits that the medical records confirming the defendant's PTSD diagnosis would have altered the sentencing information before the circuit court.

¶ 37    Nonetheless, the Steffens and Young letters and the IDOC medical records do not render counsel's performance deficient. Robert's violent and controlling nature as well as the defendant's status as a victim of domestic violence were readily apparent in the police reports submitted at sentencing. For instance, S.P. and Gordon stated that Robert forced them to engage in sexual activity through threats and violence. R.P. and Smith added that they engaged in sexual acts to make Robert happy. Thus, even though the defendant was the only witness to testify on her behalf, counsel did introduce evidence at sentencing to corroborate the defendant's contention that she was a victim of domestic violence. Counsel also argued to the circuit court that the police reports did in fact corroborate the defendant's testimony. Accordingly, the defendant has not set forth an arguable claim that counsel's performance was deficient.

¶ 38    Even if we were to determine counsel's performance was deficient, the defendant has not made an arguable claim that she was prejudiced. The defendant argues that the circuit court's statements at sentencing discounted the domestic abuse she suffered and showed that the court did not find the defendant credible. Again, the defendant's assertions are refuted by the record. Before sentencing the defendant, the circuit court recognized that the defendant was a victim and referred to Robert as a "preyer [*sic*]" and a "sick person." In denying the defendant's *pro se* postconviction petition, the court noted that domestic abuse was presented as a mitigating factor during the sentencing hearing and stated,

"Nothing has been presented that has not previously been considered \*\*\*." Although the circuit court criticized the defendant at sentencing for her role in the offense, the record shows that the circuit court believed the defendant was a victim and considered the evidence of domestic abuse at sentencing.

¶ 39    Moreover, we do not find that the letters and PTSD diagnosis attached to the petition for relief from judgment create an arguable claim that, but for counsel's alleged deficient performance, the outcome of the defendant's sentencing would have been different. The record makes clear that the circuit court considered evidence of domestic abuse at sentencing. After imposing sentence, the circuit court said, "Three years that I'm not sentencing you to the department of corrections is based upon the fact that you did not put the children though a trial with regard to this." Considering the circuit court's strong indication as to the reason for its sentence, we do not believe it is arguable that the Steffens and Young letters, or their testimony, along with a diagnosis of PTSD would have altered the circuit court's sentencing decision. Thus, the defendant has not set forth an arguable claim that she was prejudiced by counsel's alleged deficient performance.

¶ 40                                III. CONCLUSION

¶ 41    For the foregoing reasons we affirm the circuit court's first stage dismissal of the defendant's *pro se* postconviction petition.


¶ 42    Affirmed.

19