NOTICE

Decision filed 11/29/21. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2021 IL App (5th) 190094-U

NO. 5-19-0094

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Saline County. |
| | ) | |
| v. | ) | No. 12-CF-89 |
| | ) | |
| ROGER D. YOUNG, | ) | Honorable |
| | ) | Walden E. Morris, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE WELCH delivered the judgment of the court.
Justices Wharton and Vaughan concurred in the judgment.

**ORDER**

¶ 1    *Held*:    Because the defendant failed to state the gist of a constitutional claim, and any argument to the contrary would lack merit, the circuit court's order summarily dismissing the defendant's postconviction petition must be affirmed, and the defendant's appointed attorney on appeal must be granted leave to withdraw as counsel.

¶ 2    The defendant, Roger D. Young, appeals from the summary dismissal of his *pro se* petition for relief under the Post-Conviction Hearing Act. See 725 ILCS 5/122-1 *et seq.* (West 2018). He is currently serving a 32-year prison sentence for solicitation of murder for hire. The defendant's court-appointed attorney on appeal, OSAD, has concluded that this appeal lacks merit, and on that basis, has filed a motion to withdraw as counsel (see *Pennsylvania v. Finley*, 481 U.S. 551 (1987)), along with a memorandum of law in support thereof. OSAD properly served the defendant with a copy of its motion and memorandum. This court gave the defendant ample opportunity to file a

1

*pro se* response, brief, memorandum, etc., objecting to OSAD's motion or explaining why this appeal has merit, but the defendant has not done so. This court has examined OSAD's *Finley* motion and memorandum, as well as the entire record on appeal, and has determined that this appeal does indeed lack merit. Accordingly, OSAD's *Finley* motion to withdraw as counsel must be granted, and the judgment of the circuit court, summarily dismissing the defendant's postconviction petition, must be affirmed.

¶ 3                                      BACKGROUND

¶ 4                              *The Trial and the Direct Appeal*

¶ 5    In April 2012, the defendant was charged with solicitation of murder for hire. See 720 ILCS 5/8-1.2(a) (West 2012). He was accused of procuring another to murder his wife, Linda Young. In April 2014, the cause proceeded to a trial by jury. For its case in chief, the State called three witnesses and played two recordings, one audio recording and one audio-video recording.

¶ 6    David Blazier testified that he was an inspector with the Saline County Sheriff's Office, who was assigned to the Illinois State Police (ISP). In early 2012, he became involved in an investigation of the defendant when a confidential source named James Koker reported to the ISP that the defendant had asked him to find someone to hire to kill his wife, Linda Young. On March 29, 2012, Koker was surreptitiously fitted with an overhear device and engaged in conversation with the defendant. The police recorded that conversation, as Blazier listened in. On March 31, 2012, a conversation between the defendant, Koker, and "an undercover agent, Master Sergeant Beliveau," took place. The police recorded that conversation, as Blazier listened in.

¶ 7    James Koker testified that he and the defendant were "drinking buddies" at the American Legion in Eldorado, Illinois. In the summer of 2011, the defendant asked Koker whether he could find someone to kill his wife, but Koker considered this request mere "bar talk." Over time,

2

though, the defendant's requests became "more persistent," gradually increasing from "once or twice a month" to "like every time [Koker] saw [the defendant]." One afternoon, the defendant talked about having his wife killed, and he was "so serious" that Koker, upon returning home, contacted the police. Subsequently, he met with ISP agents and eventually agreed to wear an overhear device. On March 29, 2012, he wore the device during a conversation with the defendant, starting inside the American Legion and continuing inside the defendant's pickup truck, which was parked nearby. During that conversation, the defendant agreed to meet the supposed "hit man," who was actually an undercover ISP agent, that next Saturday, March 31, 2012, outside the American Legion.

¶ 8　　Koker further testified that on March 31, in a van parked near the American Legion, he introduced the defendant to the undercover agent, "J.B." Koker did not wear the overhear device that day. The defendant and the agent spoke for a while. Then, they drove to the hospital where the defendant's wife worked, and they drove the route that she took to get back to the house that she shared with the defendant. At the house, the defendant showed the agent two ATVs, a tractor, and a case full of guns that would serve as "collateral" until the life insurance money was paid out. They returned to the American Legion. On cross-examination by defense counsel, Koker denied that he ever had raised the subject of killing the defendant's wife. "[The defendant] always brought the subject up to me," Koker testified.

¶ 9　　In a 2006 case, Koker was convicted of aggravated driving under the influence of alcohol (DUI) and was sentenced to prison. In a 2010 case, he was convicted of driving while license revoked and was sentenced to probation. In July 2012, after the above-described events, he was arrested for aggravated DUI, again was convicted, and again was sentenced to prison. He also had

convictions for battery and possession of stolen property. The ISP paid Koker $100 after the first recorded conversation and $200 after the meeting between the defendant and the undercover agent.

¶ 10    An audio recording of the relevant portions of the March 29, 2012, conversation between the defendant and Koker was played for the jury. The conversation began with the two of them exchanging greetings and the defendant's asking Koker, "When are we gonna take care of this shit?" Koker suggested that they converse in the defendant's truck. Apparently, the two walked out to the truck.

¶ 11    On the audio recording, Koker then asked the defendant, "You're a hundred percent sure you want this took care of, right?" The defendant answered, "I want this shit taken care of [unintelligible] bitch takes me for everything I got." Koker told the defendant that he knew a man who was "willing to do it," but the man wanted to meet with the defendant personally. The defendant seemed surprised that the man wanted to meet him. He said to Koker, "I just want it taken care of, you know that." Koker explained that the man wanted to make sure that he would not "back out" at the last minute. "I don't back out," the defendant replied. "How long have I been after your ass?" The defendant reminded Koker that he needed to wait for the insurance money, as he had told Koker "time after time." A bit later, the defendant told Koker that he wanted her "out of [his] mother fuckin' way," and that he had been telling Koker the same "for over a fuckin' year." The defendant and Koker agreed to meet with the man on Saturday morning, at the American Legion. The defendant said that he would show the man the route that his wife regularly drove from work to their house, and that he would show the man his house and personal property so that the man could feel confident that he would be paid. "You know I want it taken care of," the defendant said, "or I wouldn't keep buggin' you about it." He added that he also wanted the car destroyed, so that he could collect the insurance money on it. Koker said that he would arrange

4

the meeting for Saturday. The defendant insisted on no telephone contact between himself and Koker. "I've got your number, you've got my number, but let's keep that shit quiet," the defendant cautioned. At the end of this conversation, the defendant stated, "I want this shit done. I'm gettin' tired of fuckin' waitin.' "

¶ 12    Joe Beliveau testified that he was an ISP agent based in the Metro-East area. He became involved in the investigation of the defendant when David Blazier was searching for an agent to handle the investigation's undercover portion. Beliveau was needed "to play *** the undercover hitman." On March 31, 2012, Beliveau arrived in Saline County, where he conferred with Blazier and other officers, and he met James Koker. Equipment for the transmission and recording of audio and video was placed inside a van, and in a coffee cup in the van. Then, Beliveau got into the driver's seat of the van, Koker got into the front passenger seat, and together they headed to a scheduled meeting with the defendant at the American Legion in Eldorado. Upon arrival, Koker got out of the van, while Beliveau remained in the driver's seat. Koker walked inside the American Legion hall and walked out with the defendant. Getting into the van, Koker again sat in the front passenger seat, and the defendant sat behind Koker and Beliveau.

¶ 13    The conversation between the defendant, Beliveau, and Koker was recorded, and a DVD of the conversation was played for the jury. The video began with Koker and the defendant getting into the van, joining Beliveau, who was in the driver's seat. Koker introduced the defendant and Beliveau, referring to the defendant by his first name only, and referring to Beliveau only as "J.B." "My boy here says you got some work," Beliveau said to the defendant, referring to Koker. "This is the real deal," Beliveau said, adding that he needed to make sure that "this is what you want." The defendant replied, "This thing's gotta be done on like a Monday or Tuesday night." Beliveau stated, "Once I get this done, it's done. You realize that, right?" The defendant answered, "Yeah."

5

(Throughout the conversation with Beliveau, the defendant referred to the intended victim only as "she," never as his wife.)

¶ 14    The DVD shows that Beliveau then drove from the American Legion to the particular hospital where the defendant's wife worked, at the defendant's suggestion. The defendant wanted to show Beliveau the car that she drove, a 2012 Ford Explorer, and the route that she took from work to the house that she shared with the defendant. Beliveau asked, "You got an idea of how you want this done?" The defendant answered, "I don't care how it's done," but he stated that he wanted the Explorer "gone too," so that he can "take the insurance on the car." Beliveau stated that his preference was to "put a bullet in her head," and the defendant commented, "Make it look like a robbery." Upon arrival at the hospital where his wife worked, the defendant pointed out the Explorer and read aloud its license-plate number. Beliveau brought up the matter of payment and said that he needed some money that day, for "tools" such as "a new banger" and gasoline. At the defendant's suggestion, Beliveau drove from the hospital toward the house that the defendant shared with his wife. The defendant stated that he would pay Beliveau $5000 from insurance proceeds. The defendant and Beliveau discussed the route in detail and considered different places along the route where the killing could occur. It became clear that the defendant wanted the killing to occur on a Monday or Tuesday as his wife drove home from work, at approximately 12:30 a.m. to 1 a.m.

¶ 15    The DVD shows that the defendant's house was far out in the country. The defendant showed Beliveau and Koker around. This portion of the undercover investigation was captured on video by a camera concealed in the coffee cup that Beliveau carried. The defendant's tour included a look at the defendant's gun collection. After a few minutes, the three men got back into Beliveau's car and headed back to the American Legion. Beliveau said that he felt confident of

payment, having seen the defendant's house. Once back at the American Legion, Beliveau requested, and the defendant gave him, $100 in advance. Beliveau assured the defendant that "it's gonna happen" on Monday night or Tuesday night. The defendant got out of the van and said to Koker, "I don't call you, you don't call me." That was the end of the undercover portion of the investigation.

¶ 16    For the defendant's case in chief, David Blazier was called as an adverse witness. According to Blazier, Koker told him that during his walk with the defendant from the American Legion hall to the undercover van, the defendant stated, "I told you I didn't want to meet this guy."

¶ 17    Colt Young, the 41-year-old son of the defendant, testified that in 2011 and 2012, the defendant dropped by his house two or three times per week. For years, Colt had been estranged from his mother, Linda Young. The defendant never had expressed anger toward Linda.

¶ 18    The defendant testified on his own behalf. According to the defendant, he had had known James Koker for four or five years. The two would bump into each other, and drink beer together, a few times per week at the American Legion hall, but that was the extent of their relationship. He did not recall complaining much to Koker about his wife, Linda, though he and Linda had argued frequently during 2011 and 2012. They had been married for 40 years. The defendant did not recall ever raising the issue of hiring someone to kill Linda, but Koker mentioned it once or twice per month in the months prior to March 2012. The defendant frequently drank to the point of intoxication, and he took several painkillers per day, due to a work injury. He thought that he was under the influence during each of the two recorded conversations that were played at trial. He could not remember participating in either conversation. He remembered meeting the driver of the van, but he could not remember the man's name, and he did not remember giving the man $100. When Koker arrived at the American Legion hall on March 31, 2012, the defendant was

7

not aware that he was going to meet a man who would kill Linda for money. He had never hurt Linda, and he did not want anyone to hurt her.

¶ 19    The jury found the defendant guilty as charged.

¶ 20    After a hearing in aggravation and mitigation, the circuit court sentenced the defendant to imprisonment for 32 years and mandatory supervised release for 3 years. The defendant filed a motion to reconsider sentence. It was denied. The defendant appealed from the judgment of conviction.

¶ 21    On direct appeal, the defendant presented two arguments. In an order entered on September 20, 2017, this court rejected the defendant's argument that his sentence represented an abuse of discretion. However, this court agreed with his argument that he was entitled to a credit of $5 per day of presentence incarceration against any assessed fines. With that one modification, the judgment of conviction was affirmed. *People v. Young*, 2017 IL App (5th) 140551-U.

¶ 22                    *The Postconviction Proceeding*

¶ 23    On August 13, 2018, the clerk of the circuit court file-stamped the defendant's *pro se* petition for postconviction relief. In his postconviction petition, the defendant claimed that

        (1) he was "actually innocent" of solicitation of murder for hire;

        (2) he was convicted "as a result of the State's inducement *** to commit a crime he was not pre-disposed to commit," in violation of due process, and the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV); and

        (3) trial counsel was constitutionally ineffective (i) for failing to raise the issue of whether the defendant "was incompetent to stand trial," (ii) for failing to conduct a reasonable pretrial investigation into whether the defendant was under the influence of

8

alcohol and controlled substance when he made incriminating statements to a police officer, and (iii) for failing to raise the issue of entrapment.

The postconviction petition was accompanied by a sworn "affidavit," which read: "I, Roger D. Young, state on oath as follows: 1. I am the defendant-petitioner in the above-captioned cause." Aside from that one sentence, the affidavit was blank.

¶ 24    In a docket-entry order dated November 2, 2018, the court noted that the petition was not verified by affidavit, as required by the Post-Conviction Hearing Act. See 725 ILCS 5/122-1(b) (West 2018). The court found that the petition did not have attached thereto affidavits, records, or other evidence supporting the petition's allegations, or state why they were not attached, also as required. See *id.* § 122-2. It was on that basis that the court summarily dismissed the defendant's petition.

¶ 25                                   ANALYSIS

¶ 26    The defendant appeals from the circuit court's summary dismissal of his *pro se* postconviction petition. Appellate review is *de novo*. *People v. Boykins*, 2017 IL 121365, ¶ 9. Therefore, this court may affirm the summary dismissal on any proper ground. *People v. Lee*, 344 Ill. App. 3d 851, 853 (2003).

¶ 27    As previously mentioned, the defendant's court-appointed attorney on appeal, OSAD, has concluded that this appeal lacks merit and has filed a *Finley* motion to withdraw as counsel. This court agrees that the appeal lacks merit.

¶ 28    The Post-Conviction Hearing Act (Act) provides a method by which a defendant may assert that his conviction resulted from a substantial violation of his federal or state constitutional rights. 725 ILCS 5/122-1(a)(1) (West 2016); *People v. Smith*, 2015 IL 116572, ¶ 9. In his petition under the Act, the defendant must "set forth the specific manner in which his rights were violated."

9

*People v. Porter*, 122 Ill. 2d 64, 74 (1988). "The petition shall have attached thereto affidavits, records, or other evidence supporting its allegations or shall state why the same are not attached." 725 ILCS 5/122-2 (West 2016).

¶ 29    In the first stage of proceedings, the Act requires the circuit court to independently examine a defendant's postconviction petition and enter an order thereon. *Id.* § 122-2.1(a); *People v. Edwards*, 197 Ill. 2d 239, 244 (2001). The circuit court needs to determine whether it should summarily dismiss the defendant's petition as frivolous or patently without merit (725 ILCS 5/122-2.1(a)(2) (West 2016)) or should order the petition to be docketed for further consideration (*id.* § 122-2.1(b)). *Edwards*, 197 Ill. 2d at 244-46. A *pro se* postconviction petition may be dismissed as frivolous or patently without merit only if its allegations, taken as true and liberally construed, fail to state the " 'gist of a constitutional claim.' " *Id.* at 244 (quoting *People v. Gaultney*, 174 Ill. 2d 410, 418 (1996)). In other words, the petition may be dismissed "only if [it] has no arguable basis either in law or in fact." *People v. Hodges*, 234 Ill. 2d 1, 16 (2009). "A petition which lacks an arguable basis either in law or in fact is one which is based on an indisputably meritless legal theory or a fanciful factual allegation." *Id.* The failure to attach the necessary affidavits, etc., or to explain their absence, is " 'fatal' " to a postconviction petition and " 'by itself justifies the petition's summary dismissal.' " *People v. Delton*, 227 Ill. 2d 247, 255 (2008) (quoting *People v. Collins*, 202 Ill. 2d 59, 66 (2002)).

¶ 30    The first allegation in the defendant's postconviction petition was that the defendant was "actually innocent" of solicitation of murder for hire. The due process clause of the Illinois Constitution affords postconviction petitioners the right to assert a freestanding claim of actual innocence based on newly discovered evidence. *People v. Washington*, 171 Ill. 2d 475, 489 (1996). To win relief under that theory, the defendant must adduce evidence that is newly

10

discovered, material, noncumulative, and of such conclusive character that it would probably change the result on retrial. *People v. Barrow*, 195 Ill. 2d 506, 540-41 (2001). Here, the defendant did little more than make a bald assertion that he was actually innocent. He did not adduce any evidence that was newly discovered, etc., to support his assertion. His only "substantive" affidavit was his own, and aside from the sentence identifying himself as "the defendant-petitioner in the above-captioned cause," that affidavit was left blank. The defendant failed to set forth an arguable claim of actual innocence requiring further proceedings under the Act.

¶ 31 The second allegation in the defendant's postconviction petition was that he was convicted "as a result of the State's inducement *** to commit a crime he was not pre-disposed to commit," in violation of due process, and the fifth and fourteenth amendments to the United States Constitution (U.S. Const., amends. V, XIV). This claim is based on section 7-12 of the Criminal Code of 2012—the entrapment statute—which states that a person is not guilty of an offense if his conduct is "incited or induced by" a police officer for the purpose of obtaining inculpatory evidence on that person. 720 ILCS 5/7-12 (West 2016). However, section 7-12 is "inapplicable if the person was pre-disposed to commit the offense" and the police officer "merely affords to that person the opportunity or facility for committing an offense." *Id.*

¶ 32 A few comments can be made about the defendant's use of the entrapment defense on appeal. First, the defendant did not invoke the affirmative defense of entrapment at trial, and therefore he cannot rely on that defense now. *People v. Morgan*, 98 Ill. App. 2d 435, 439 (1968) ("Where the defense of entrapment is not urged in the trial court, as is the situation in the instant case, it is not available on appeal."). Second, the longstanding rule in Illinois is that a defendant cannot assert the entrapment defense unless he first acknowledges that all the elements of the crime are present, *i.e.*, he must admit a crime before pursuing an entrapment defense. *People v. Gillespie*,

11

136 Ill. 2d 496, 501 (1990). Here, the defendant at trial did not admit to the crime of solicitation of murder for hire (and he now claims to be actually innocent of that offense). The entrapment defense was simply unavailable to the defendant. Third, there is (essentially) no chance that the entrapment defense would have changed the trial's result, for there was abundant evidence that the defendant was predisposed to commit solicitation of murder for hire, and that the undercover police officer merely afforded him the opportunity or facility to arrange to have his wife killed for money. For example, the defendant told Koker, during the audio-recorded conversation between the two of them, that he wanted his wife "out of [his] mother fuckin' way" and that he had been telling Koker the same "for over a fuckin' year." During the audio-and-video-recorded conversation with the undercover officer in the van, the defendant made clear that he wanted his wife dead. He specified a time frame for the murder, detailed her expected whereabouts during that time frame, offered comments on the various places where the killing could occur, discussed payment, and gave the undercover officer a $100 down payment. Given the content of the recorded conversations, it is extremely improbable that an entrapment defense would have succeeded in this case.

¶ 33    The defendant's third, and last, postconviction allegation was that trial counsel was constitutionally ineffective for three alleged failings: (i) not raising the issue of whether the defendant "was incompetent to stand trial," (ii) not conducting a reasonable pretrial investigation into whether the defendant was under the influence of alcohol and controlled substance when he made incriminating statements to a police officer, and (iii) not raising the issue of entrapment.

¶ 34    A defendant is deprived of his constitutional right to the effective assistance of counsel when (1) counsel provides assistance that is objectively unreasonable and (2) there is a reasonable probability that, but for counsel's error, the outcome of the proceedings would have been different.

*Strickland v. Washington*, 466 U.S. 668, 687-88 (1984). At the first stage of postconviction proceedings, a petition must raise an arguable claim as to each of the two prongs of ineffective assistance. *Hodges*, 234 Ill. 2d at 17. Failure to make the required showing as to either prong defeats the claim of ineffectiveness. *People v. Morgan*, 187 Ill. 2d 500, 529-30 (1999).

¶ 35 The defendant asserted that trial counsel was ineffective for not raising the issue of whether he was "incompetent to stand trial." This court presumes that the defendant intended to say that counsel was ineffective for failing to raise the issue of *fitness* to stand trial. The right to be fit for trial is fundamental. *People v. Sandham*, 174 Ill. 2d 379, 382 (1996). Due process bars the prosecution of the unfit. *People v. Brown*, 236 Ill. 2d 175, 186 (2010). A defendant is presumed fit unless, due to a mental or physical condition, he is unable to understand the nature and purpose of the proceedings against him or to assist in his defense. *Id.* Here, the defendant certainly did name an issue that is appropriate for postconviction proceedings, but he failed to accompany his postconviction petition with any affidavits, records, or other evidence supporting his allegation of unfitness, or to explain their absence. See 725 ILCS 5/122-2 (West 2016). Because of that failure, this claim was patently without merit.

¶ 36 The defendant asserts that trial counsel was ineffective for not conducting a reasonable pretrial investigation into whether the defendant was under the influence of alcohol and controlled substance when he made incriminating statements to a police officer. This court presumes that the defendant is referring to the incriminating statements that he made to undercover police officer Joe Beliveau, the statements that were recorded and played for the jury. At trial, the defendant sought to rely on intoxication as an explanation for his statements to Beliveau. He testified that he believed that he was under the influence of alcohol and pain medicine at the time of his statements. Due to his regularly consuming alcohol to the point of intoxication and his taking several pain pills

13

per day, the defendant could not remember making those incriminating statements. So, trial counsel surely was aware of this explanation for the defendant's incriminating statements to Beliveau. Moreover, the defendant did not accompany his postconviction petition with any affidavit, etc., specifying the type of evidence that "a reasonable pretrial investigation" would have revealed, or explain the absence of such documents. Therefore, this claim is patently without merit. As an aside, this court notes that it is difficult to imagine additional evidence on this point that would have mattered at the defendant's trial. At the time of his statements to Beliveau, the defendant appeared sober and rational, and not at all under the influence of alcohol or drugs, as the DVD recording makes clear.

¶ 37   The defendant also asserts that trial counsel was ineffective for not raising the issue of entrapment. This claim is frivolous, for the reasons stated in this court's discussion of the second allegation in the defendant's postconviction petition. An entrapment defense would have had (essentially) no chance of success. There was abundant evidence that the defendant was predisposed to commit solicitation of murder for hire, and that the undercover police officer merely afforded him the opportunity or facility to arrange to have his wife killed for money. Accordingly, the defendant cannot show that he was harmed by trial counsel's not raising the issue of entrapment.

¶ 38                                    CONCLUSION

¶ 39   The defendant failed to state the gist of a constitutional claim. Any argument to the contrary would lack substantial merit. Accordingly, OSAD is granted leave to withdraw as counsel, and the judgment of the circuit court, summarily dismissing the defendant's postconviction petition, is affirmed.

¶ 40   Motion granted; judgment affirmed.

14