**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 200054-U

Order filed September 29, 2023

_____

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 10th Judicial Circuit, Peoria County, Illinois, |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-20-0054 Circuit No. 19-CF-209 |
| JERMAINE LAWSON, | ) ) ) | Honorable Katherine S. Gorman, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ALBRECHT delivered the judgment of the court.
Justices Brennan concurred in the judgment.[1]
Justice McDade dissented.

_____

**ORDER**

¶ 1       *Held*:  (1) Defendant was proven guilty beyond a reasonable doubt of being an armed habitual criminal. (2) The State did not violate defendant's due process rights.

¶ 2       Defendant, Jermaine Lawson, appeals his conviction for being an armed habitual criminal, arguing (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt, and

_____

[1] Justices Albrecht and Brennan were administratively reassigned to this case on September 12, 2023, due to the retirement of previously assigned panel members.

(2) the State violated his due process rights to a fair trial by failing to correct false testimony. We affirm.

¶ 3                                                                    I. BACKGROUND

¶ 4            In April 2019, defendant was charged with being an armed habitual criminal (720 ILCS 5/24-1.7(a) (West 2018)) and unlawful possession of a weapon by a felon (*id.* § 24-1.1(a)). The State filed a motion to compel defendant to permit the taking of buccal swabs to compare to DNA evidence collected from the firearm. The State further filed a disclosure stating that the buccal swabs and swabs from the firearm would be consumed in the DNA testing process. The court granted the State's motion without objection. On May 21, 2019, the same parties were in court on another case that defendant had just been acquitted on. Defense counsel asked the State if it was still waiting for the DNA evidence in this case, and the State answered, "[y]ep."

¶ 5            The case proceeded to a jury trial on December 9, 2019. The witnesses consisted of Officer Joseph Harris of the Peoria Police Department and Deputies Aaron Witt, Austin Griggs, and Cody Meeks of the Peoria County Sheriff's Office. Their testimony provided as follows: On April 14, 2019, Meeks was on duty at approximately 2:55 a.m. and executed a traffic stop on a vehicle with an improperly functioning left taillight. The vehicle pulled to the side of the road, and Meeks approached the vehicle. Meeks identified defendant as the driver of the vehicle. Defendant appeared to be nervous, as his hand was shaking, therefore, Meeks called for a canine unit and began his "citation process" for the taillight violation. While he was working on the citation, Deputies Witt and Griggs arrived at the scene. Defendant's vehicle then drove off, and the officers pursued.

¶ 6            Once defendant reached a dead end, he abandoned the vehicle and fled on foot. Meeks ran after him. Defendant ran behind an apartment complex, and Meeks followed, but lost sight of him.

The area behind the complex was not a high traffic area and was not accessible by a sidewalk. A hill descended to a wooded area behind the complex. There was a fence near the wooded area. Meeks saw defendant again at the bottom of the hill where defendant was on his hands and knees. Defendant then began to scale the fence. Meeks chased him to the fence, where defendant either fell off the fence or Meeks pulled him off the fence. Meeks and defendant grabbed each other. Meeks then pushed defendant and deployed his taser. The taser did not have the intended effect, so Meeks discarded the taser cartridge and reloaded it. At that point, defendant climbed over the fence. Meeks deployed his taser again, but he did not know if it made contact with defendant. Defendant continued to flee. Meeks informed other officers in the area that defendant had fled and provided a description. Harris joined the other officers canvasing the area in search of defendant. Another officer saw defendant lying in a field and flashed his light on him. Defendant began running into the woods. Harris ran after him and found him hiding behind a tree. Harris took defendant into custody. Harris was wearing a body camera and a portion of the video was played for the jury.

¶ 7        Witt began a search of the area near the fence and found "a black Glock handgun" in the wooded embankment. He also found Meeks's taser cartridges a couple feet away. Witt identified the firearm in court. He stated that he stood by it until it was collected as evidence. Witt called Meeks back to the area, and Meeks observed the firearm where he left his taser cartridges. Meeks testified that the firearm was clean, without damage. He did not see any "leaves, twigs, mud," nor was there "much condensation on top [though] it had been raining for a period of time." Based on his training and experience, it did not look like the firearm had been there for long. Meeks's squad car and body cameras were working properly and were on at the time, portions of which were played into evidence. A separate magazine was also found near the taser cartridges. There was one

3

projectile in the chamber of the firearm. Photographs of the fence, firearm, taser cartridges, magazine, and projectile were entered into evidence.

¶ 8     Griggs testified that he was the canine officer that responded to the call. Once defendant had been apprehended, Griggs removed the dog from his squad car. A sweatshirt was found with defendant, and Griggs used the dog for "an article search," which he stated was "to use the dog to locate any discarded items a person may have tossed during the path of flight." He would "take the dog to the area that [he] need[ed] searched, and *** give him a *** seek it command." Griggs took the dog from where defendant was apprehended to the fence he had scaled. On the other side of the fence was the pistol.

¶ 9     When questioned by defense counsel, Meeks agreed that he and defendant were in close contact near the fence, and he never saw defendant with the firearm. He did not believe that the gun had ever been fingerprinted. When asked whether any testing was done to determine if DNA was found on the gun, Meeks answered, "[t]o my knowledge, no, there wasn't any done."

¶ 10     During closing arguments, defense counsel argued, in part,

"Do you know what beyond a reasonable doubt would have been? [Defendant]'s fingerprint on the magazine, on the gun, on a bullet. Any of the above.

Dusting of a fingerprint. Send it to the lab. See if you get a match. He is on parole. They have his fingerprints. They have him in custody. All they have to do is take a fingerprint and compare it.

Number two alternative, in the world that we have today in the medical evidence and the medical accessible we have to take a buccal swab of somebody,

4

get a DNA sample, rub that same—a different swab off of that gun, send the two swabs in.

Let's see. Do we have DNA? Does it mean if it's missing that he didn't possess it? Not necessarily. Maybe, but if it was there, talk about the nail in the coffin.

We wouldn't be standing here today. That would of been proof beyond a reasonable doubt that [defendant]'s fingerprints or DNA were on that gun, proof beyond a reasonable doubt that he possessed that weapon, but they didn't even take the step to attempt to do that, and they were very clear in that."

The State responded that they did not need DNA evidence or fingerprinting, stating, "juries convict suspects, [d]efendants every day in the United States beyond a reasonable doubt, and they do that without DNA and they do that without fingerprints." The jury found defendant guilty of being an armed habitual criminal and unlawful possession of a weapon by a felon. The counts merged, and he was sentenced to 16 years' imprisonment for being an armed habitual criminal.

¶ 11                                      II. ANALYSIS

¶ 12        On appeal, defendant argues that (1) the evidence was insufficient to prove him guilty beyond a reasonable doubt of being an armed habitual criminal, and (2) the State violated his due process rights by failing to correct false testimony. We consider each argument in turn.

¶ 13                            A. Sufficiency of the Evidence

¶ 14        When examining a challenge to the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *People v. Collins*, 106 Ill. 2d 237, 261 (1985). A reviewing court will not substitute its judgment for that of the trier

of fact regarding the weight of the evidence or witness credibility. *People v. Herring*, 2018 IL App (1st) 152067, ¶ 59.

¶ 15    In order to convict defendant of being an armed habitual criminal, the State had to prove defendant (1) possessed a firearm and (2) had been convicted a total of two or more times of certain qualifying offenses. See 720 ILCS 5/24-1.7(a) (West 2018). Defendant does not contend that the State failed to prove that he had the requisite convictions. Therefore, the only question before us is whether the State proved that defendant possessed the firearm.

¶ 16    Possession may be actual or constructive. *People v. Givens*, 237 Ill. 2d 311, 335 (2010). " '[C]onstructive possession of a firearm may be shown where the person has knowledge of the presence of the weapon and exercises immediate and exclusive control over the area where the firearm is found.' " *People v. Wise*, 2021 IL 125392, ¶ 25 (quoting *People v. Brown*, 2020 IL 124100, ¶ 11). "Evidence of constructive possession is 'often entirely circumstantial.' " *People v. McCarter*, 339 Ill. App. 3d 876, 879 (2003) (quoting *People v. McLaurin*, 331 Ill. App. 3d 498, 502 (2002)); see also *People v. Bogan*, 2017 IL App (3d) 150156, ¶ 27. Inferences that defendant knew contraband was where it was found can be shown by a defendant's acts, words, or conduct. *People v. Faulkner*, 2017 IL App (1st) 132884-B, ¶ 39. Further, a defendant's proximity to the weapon is relevant. *Wise*, 2021 IL 125392, ¶ 29. Defendant must " 'have some type of *immediate access to* or *timely control over* the weapon.' " (Emphases in original.) *Id.* ¶ 31 (quoting *People v. Condon*, 148 Ill. 2d 96, 110 (1992)). "Knowledge and possession are questions of fact to be resolved by the trier of fact, whose findings should not be disturbed upon review unless the evidence is so unbelievable, improbable, or palpably contrary to the verdict that it creates a reasonable doubt of guilt." *People v. Luckett*, 273 Ill. App. 3d 1023, 1033 (1995).

¶ 17        Here, the evidence established that defendant fled from police officers when the canine unit arrived. This tended to show consciousness of guilt. See *People v. Harris*, 52 Ill. 2d 558, 561 (1972). Meeks lost sight of defendant while he was fleeing, and, when he saw him again, defendant was on his hands and knees at the base of the hill where the officers ultimately found the firearm. Defendant's position on the ground at the location of the firearm gave him immediate access and control over it and enabled him to make an instantaneous decision to use it if he chose to do so. Based on defendant's actions, the jury could have inferred that defendant had knowledge of the firearm. Moreover, the firearm was found in a remote area; no one else was around; and, despite the fact that it had been raining, it was clean without much condensation or other natural matter on it. Taking the evidence in the light most favorable to the State, a rational trier of fact could have found defendant constructively possessed the firearm as required to convict him of being an armed habitual criminal.

¶ 18        In coming to this conclusion, we reject defendant's reliance on *People v. Sams*, 2013 IL App (1st) 121431, and *People v. Wright*, 2013 IL App (1st) 111803, for the proposition that a conviction based on constructive possession cannot be sustained where there is no physical evidence or eyewitnesses linking the defendant to the firearm. First, neither *Sams* nor *Wright* stand for this proposition. As stated above (*supra* ¶ 16) constructive possession is most often proven by circumstantial evidence as opposed to direct evidence. Second, both *Sams* and *Wright* are factually distinguishable from this case. In *Sams*, no one saw the defendant with the gun or in the room in which the gun was eventually found. *Sams*, 2013 IL App (1st) 121431, ¶ 13. The defendant was visiting the home. *Id.* ¶ 14. The gun was not easily visible or accessible; officers only found it under the couch after reentering the home. *Id.* Unlike in this case, there was no indication that the

7

defendant in *Sams* was in the immediate vicinity and would have been able to access the weapon. See *id.*

¶ 19       Similarly, in *Wright*, the police chased the defendant and another man down a flight of stairs into a basement. *Wright*, 2013 IL App (1st) 111803, ¶ 26. While descending the stairs, both men fell and landed on the floor. *Id.* The firearm was found partially under the defendant, but there were already three other individuals in the basement, and there was no evidence presented that the gun belonged to the defendant as opposed to one of the other individuals present. *Id.* In the instant case, no one else was around and it was not a high traffic area.

¶ 20                                                    B. False Testimony

¶ 21       Next, defendant argues the State violated his due process rights by failing to correct false testimony. Specifically, defendant argues Meeks falsely testified that no DNA testing on the firearm was completed, the State knew this was false but failed to correct it, and the State adopted this false testimony in their closing argument.[2]

¶ 22       A defendant's due process rights are violated where the State knowingly uses perjured testimony to obtain a conviction. *People v. Barrow*, 195 Ill. 2d 506, 529-30 (2001). When the State knows testimony presented was false, it has an obligation to correct such testimony, even where it did not solicit it. *People v. Lucas*, 203 Ill. 2d 410, 416-24 (2002). Where a conviction is obtained by the knowing use of perjured testimony and the State fails to correct it, the verdict must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *People v. Olinger*, 176 Ill. 2d 326, 345 (1997); *Barrow*, 195 Ill. 2d at 530.

---

[2]While the State argues this issue is forfeited, we find that it is properly before us. See *People v. Bolton*, 10 Ill. App. 3d 902, 907 (1973). We, therefore, need not consider defendant's alternative argument of ineffective assistance of counsel.

¶ 23    Here, there is no indication that false testimony was presented that the State failed to correct. Meeks testified that, to his knowledge, DNA testing was not done on the firearm. While the State initially began the process to test the firearm for DNA, there is no indication in the record that this DNA testing was ever completed. We will not speculate that it was completed, just by the State's request for such testing approximately seven months before trial. Moreover, as stated above (*supra* ¶¶ 16-17), the State did not need direct evidence to show that defendant constructively possessed the firearm, which was sufficiently done through circumstantial evidence. See *Bogan*, 2017 IL App (3d) 150156, ¶ 27.

¶ 24    Therefore, we find that the State did not violate defendant's due process rights. However, we would be remiss if we did not note that, if there is evidence outside of the record that DNA testing was done to support a claim of perjury or prosecutorial misconduct, defendant can raise such a claim and present such evidence in a collateral proceeding.

¶ 25                                III. CONCLUSION

¶ 26    The judgment of the circuit court of Peoria County is affirmed.

¶ 27    Affirmed.

¶ 28    JUSTICE McDADE, dissenting:

¶ 29    I dissent from the majority decision to affirm defendant's conviction as an armed habitual criminal.

¶ 30    Appellate review of a circuit court's decision begins with the assumption that each part of the criminal justice system—the police, prosecution, defense, and court—has performed its function with diligence, integrity, and honesty. At times, a case comes before us in which one or more of those integral components have failed. See, *e.g.*, *People v. Washington*, 2023 IL 127952, ¶¶ 56-59 (discussing police misconduct); *People v. Blue*, 189 Ill. 2d 99, 126-42 (2000)

(addressing prosecutorial misconduct); *People v. Harris*, 206 Ill. 2d 293, 318-24 (2002) (addressing ineffective assistance of counsel); *People v. Vargas*, 174 Ill. 2d 355, 360-72 (1996) (addressing judicial conduct that impinged on the integrity of the justice system and the defendant's right to a fair trial). I believe this is one of those cases.

¶ 31    The critical element of defendant's charged offense is that he was armed at the time he committed it. The relevant question for us is not whether he committed that offense, but rather whether the State *proved* him guilty of it beyond a reasonable doubt. If our analysis discloses significant procedural flaws in the investigation or prosecution that cast reasonable doubt on the guilt of the defendant, then the State has failed to meet its burden of proof and we must reverse.

¶ 32    Here, the State did not prove defendant guilty beyond a reasonable doubt. Moreover, it offered no excuse for its failure to do so. Instead, the prosecutor's closing argument justified the State's intentional lack of direct evidence, saying that such evidence was not necessary. Specifically, the prosecutor stated that "juries convict suspects, [d]efendants every day in the United States beyond a reasonable doubt, and they do that without DNA and they do that without fingerprints." *Supra*, ¶ 10. In so saying, the State suggested to the jury that there is something akin to precedent that authorizes not taking prudent procedural steps to use the best evidence to prove its case.

¶ 33    Here there appears to be no excuse for trying defendant without direct evidence that he actually possessed a weapon since nothing shows that such evidence was inaccessible; the police and the State just could not be bothered to gather and/or process it. Defendant was "compelled" to give a buccal swab for DNA testing, and it was represented by the State that there was DNA from the weapon for purposes of comparison. *Supra*, ¶ 4. No fingerprints were taken or used to establish contact with or possession of the gun the officers found. None of the officers ever saw

the gun in defendant's possession, nor did the body and car cameras, which "were working properly and were on at the time," show defendant with a gun. A jury might reasonably question why there was no DNA or fingerprint evidence since the State had both defendant and the gun. Jurors might wonder if such evidence was not presented because it disfavored the State. And they might then speculate about why no one saw defendant with the gun. Indeed, defense counsel argued that proof beyond a reasonable doubt was not there for those very reasons. *But for* the prosecutor's assurance that the State secures convictions "every day in the United States" with only inferences and not evidence, the jury might have *had doubts*.

¶ 34　　　　We, too, might have doubts, but our standard of review requires us to sublimate them and to look at the evidence "in the light most favorable to the State." So, we do not hear that the gun found on the ground had no dirt, leaves, twigs, or condensation on it and say, "of course it didn't; it was raining." We accept the State's implication that defendant had just dropped it there. We do not hear that the police dog lingered at the fence and say, "of course it did; the defendant was just clambering over it." We accept the State's implication that it was because the gun was lying on the other side of the fence. We are left, as was the jury, to rely on possibly faulty inferences because the State seemingly elected to proceed without securing or presenting actual direct evidence.

¶ 35　　　　It is certainly possible—it may even be likely—that defendant had been in possession of the gun and had dropped it. But "possible" and "likely" do not satisfy the State's burden of proof. Just because the State has managed in the past to convince jurors that "likely" is the equivalent of "beyond a reasonable doubt" does not mean that we should put the *imprimatur* of the judiciary on prosecutors' choices not to secure or present available direct evidence. It is, at least in part, this kind of review that has earned Illinois its standing of *first* of the fifty states in

11

the number of wrongful convictions and *first* in the number of years served by innocent people in our Department of Corrections.  See *Exonerations in the United States Map*, The National Registry of Exonerations website (Sept. 27, 2023), https://www.law.umich.edu/special/exoneration/Pages/Exonerations-in-the-United-States-Map.aspx?. These are charged individuals who have gone through trial level proceedings; usually one, sometimes both levels of judicial review; and are still convicted of someone else's crime.

¶ 36    I do not argue that this defendant is one of those, but in this unnecessarily amorphous situation, he *could be*. That, in my mind, equates to reasonable doubt.